SEA–LAND SERVICE, INC., Appellant,

v.

John T. CONNOR et al., Appellees.

No. 22140.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 28, 1969.

Decided June 4, 1969.

Mr. Edward M. Shea, Washington, D. C., with whom Mr. John Mason, Washington, D. C., was on the brief, for appellant.

Mr. Leavenworth Colby, Atty., Department of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., at the time the brief was filed, Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, and John C. Eldridge, Washington, D. C., Attorney for appellee Connor and certain other appellees.

Mr. Richard W. Kurrus, Washington, D. C., with whom Mr. James N. Jacobi, Washington, D. C., was on the brief, for appellee American Export Isbrandtsen Lines, Inc.

Before McGowan, Tamm and Leventhal, Circuit Judges.

**TAMM, Circuit Judge:**

Since approximately seventy percent of the world's surface is covered by water and since possibly more than seventy percent of this country's foreign trade is carried, at some time, in the holds or on the decks of water-borne carriers and further, since this country is constantly striving to have the finest fleet of merchant ships, Congress, in 1936, enacted the Merchant Marine Act as the vehicle to provide for a sufficient service in shipping, a back-up force for national defense, an opportunity opened only to United States' citizen-entrepreneurs and the best, safest and grandest fleet in the world. To implement these ends Congress saw fit to establish the United States Maritime Commission, 46 U.S.C. § 1111 *et seq.* (1964), as its regulatory arm. That organ worked to make our merchant marine fleet capable of competing with foreign flag vessels by extending government aid, in the form of subsidies, to insure the viability of the more costly American-flag shipping. In 1961, pursuant to Reorganization Plan No. 7, 75 Stat. 840, as amended, the area of economic assistance in this field was thereafter overseen by the Secretary of Commerce, the Maritime Administration and the Maritime Subsidy Board (hereinafter collectively known as the "Secretary"). The Secretary, when acting in this area, must adhere to the pertinent sections of the Merchant Marine Act or find itself out of step with the law. It is the position of the appellant that such imprecision with the law by the Secretary, in violating

certain procedural requirements of notice of application for subsidy, is cause for reversal of the district court's affirmance of the Secretary's action. We are in accord with that position and reverse the implicit finding of lawful conformance by the trial court in its grant of summary judgment to the appellee.

In 1962 American Export Isbrandtsen Lines, Inc. (hereinafter "Export") was granted permission to operate a non-subsidized trade over Route Nos. 5–7–8–9 between the northeastern United States and the western countries of Europe. Under its agreement Export was to utilize two break-bulk type vessels,[1] the S.S. Remsen Heights and the S.S. Sir John Franklin for a maximum total of 18 sailings per year. On February 24, 1964, Export filed with the Secretary an application for an operating-differential subsidy under Subchapter VI of the Merchant Marine Act of 1936, as amended, 46 U.S.C. § 1171 *et seq.* (1964), with regard to this same route. In that application Export requested "that the Operating-Differential Subsidy[2] Agreement between the United States * * * and Export * * * (Contract No. FMB–87)[3] be amended to include authority to operate the S.S. Sir John Franklin and S.S. Remsen Heights in *subsidized service* on Trade Routes Nos. 5–7–8–9 * * *." (Attachment #1, p. 18; emphasis supplied.) The application also requested permission "to interchange the vessels (Remsen Heights and Sir John Franklin) * * * with the other cargo vessels used by it on its Lines [*sic*] G and Line H. * * * *"* (Attachment #1, p. 19.) Lines G and H were also served by vessels of the break-bulk type (Attachment #1, p. 17). Export further noted that "as to Applicant's long-range vessel replacement plans * * * [i]t is contemplated that suitable replacement for the SS Sir John Franklin and the SS Remsen Heights, *the subject of this Application,* will be agreed upon." (Emphasis supplied, Attachment #1, p. 43.) The application urged the need for additional vessels to operate these routes in the face of an inadequate service by United States' flag vessels.

On April 1, 1964, this application, pursuant to 46 C.F.R. § 201.72 (1968), was published in the Federal Register inviting "interested parties" to file for leave to intervene in a hearing under section 605(c) of the Act to determine "(1) whether the application is one with respect to vessels to be operated on a service, route or line served by citizens of the United States which would be in addition to the existing service * * * and, if so whether the service already provided by vessels of United States registry * * * is inadequate, and (2) whether in the accomplishment of the purposes and policy of the Act additional vessels should be operated thereon." (Attachment #8, p. 2.) Section 605(c) of the Merchant Marine Act of 1936, as

---

1. Break-bulk type vessels are the more or less conventional bulk cargo vessels, where cargo is loaded in bulk lots from the pier by means of rope or wire slings suspended from a crane and placed, categorically, in the ship's holds. When the ship is loaded it, in effect, becomes a floating super-market with its many commodities separated by wooded dunnage. This system of cargo handling is in contrast to containerized service. There the cargo is within steel trailers or lockers at dockside and, rather than hoisting the cargo itself, the thing that is taken aboard ship is the container. When the container ship is loaded it, in effect, becomes a floating trailer-court with its cargo in separate steel cells.

2. An operating-differential subsidy is a grant in aid to the carrier which permits it to operate the higher cost American flag vessels by charging rates competitive with the comparatively low cost foreign flag vessels. For an oversimplified example, if it costs $2.00 to ship a television from Baltimore to Liverpool on an American vessel and only $1.50 on a foreign flag carrier, the ideal operating differential subsidy to the American-flag vessel would be 50¢.

3. This was the subsidy contract heretofore mentioned entered into in 1962 of which the unsubsidized Route 5–7–8–9 was a part.

amended, 46 U.S.C. § 1175(c) (1964), requires that

> [n]o contract (of subsidy) shall be made * * * with respect to a vessel to be operated on a * * * route * * * served by citizens of the United States *which would be in addition to the existing services* * * * unless the Federal Maritime Board shall determine *after proper hearing of all parties* that the service already provided by vessels of United States registry * * * is inadequate, and that in the accomplishment of the purposes * * * of this chapter *additional vessels* should be operated thereon * * *. (Emphasis supplied.)

The statute goes on to require

> no contract shall be made * * * if the Board shall determine the effect of such a contract would be to give undue advantage or be unduly prejudicial, as between citizens of the United States, in the operation of vessels in competitive services * * * unless following public hearing, due notice of which shall be given to each line serving the route, the Board shall find * * * it is necessary to enter into such contract in order to provide adequate service by vessels of United States registry.

Waterman S.S. Company, a wholly-owned subsidiary of McLean Industries, Inc. (the parent company of Sea-Land Service), was the only petitioner for intervention for it also served Trade Routes Nos. 5–7–8–9 at the time of the February 24, 1964, application. However, Waterman was thereafter sold to a third party and its intervention dropped.

On May 21, 1964, a prehearing conference was held before the Secretary's trial examiner and, in the absence of opposition to or petitions for intervention in the grant of subsidy, the application was forwarded to the Secretary for administrative determination. On Feb-

ruary 8, 1965, the Office of Government Aid of the Secretary recommended that Export's application be approved "on an interim subsidized basis pending replacement." (J.A. 41.) However, action on that recommendation was deferred pending the outcome of a second application hereinafter discussed.

On April 7, 1965, Export applied to the Secretary for an establishment of "the *first fully containerized steamship service* in the foreign commerce of the United States, which service [it] believe[d] [would] offer *unprecedented benefits.* * * * *"* (Attachment #12, p. 1, emphasis supplied.) This application was filed on behalf of a yet to be formed subsidiary of Export to be known as Container Marine Lines, Inc. In that application Export requested a "construction-differential subsidy" to enable it to convert two vessels (ore carriers) into cellular containerized ships. While Export considered its application as being only a "containership program being * * * actually a pilot or experimental proposal" it sought an operating-differential subsidy for the operation of these vessels when they would come on the Trade Route Nos. 5–7–8–9 in the place of the Remsen Heights and Sir John Franklin. This second application was not formally noticed in the Federal Register [4] by the Secretary nor was a public hearing offered in that regard.

In the interim, between the filing of the first and second application, on September 1, 1964, appellant, Sea-Land Service, Inc. (hereinafter "Sea-Land"), instituted certain pre-inaugural plans for a containership service over this same trade route. Sea-Land is and has been operating on a non-subsidized basis with respect to the operating-differential aid of the Secretary. Its planned container service would also be a non-subsidized service. That service was, in fact, instituted in March of 1966 and has been

---

4. This application was, however, given press coverage in the N.Y. Times and in a certain trade journal "of general

circulation in the shipping industry." (J.A. 46.)

continuously in service through weekly sailings since that time.

On August 16, 1965, Export was notified that the Secretary had "denied [its] application of February 24, 1964, regarding the SSs Remsen Heights and Sir John Franklin. * * *" (Attachment #10.) However, this disappointment was lessened by the fact that the Secretary, in certain letters of August 13, 1965, had notified Export that on August 12, 1965, it had approved "the application * * * [d]ated April 7, 1965, as supplemented May 5, 1965, and June 2, 1965." (Attachments # 26, 27.) In addition, the Secretary, by press release dated August 19, 1965, noted its grant of subsidy under the April 7, 1965, application as well as its denial of the February 24, 1964, application. (Attachment # 28.)

A petition for "reopening for the purpose of rehearing, reargument, or reconsideration," was served on the Maritime Subsidy Board and the Maritime Administration by Sea-Land on September 1, 1965, pursuant to 46 C.F.R. § 201.174 (1968). On September 9, 1965, the Board Administrator denied Sea-Land's petition to reopen (J.A. 17). Ten days later Sea-Land petitioned for Secretarial review of the lower determination but this also was denied on October 4, 1965. Sea-Land filed a complaint in the district court to review, enjoin and set aside the Secretary's determination alleging that the Secretary had proceeded unlawfully in granting the application of April 7, 1965, in that it did not give formal notice of the application nor was a public hearing held to determine conformance with statutory mandate. The Secretary answered that the plaintiff lacked standing to contest such activity and that, in any event, the complaint failed to state a claim upon which relief could be granted. The district court, after making findings of fact and conclusions of law, held that since the construction by the Secretary of the April 7, application—namely, that it was merely an amendment to the February application—was a reasonable construction, notice of the first application met the requirements of notice under the second application. "In any event," the court concluded, "it was within the discretion of the Maritime Administration to so construe the application." (J.A. 113.) In view of that determination the court did not pass on the issue of standing. Upon denial of its petition, Sea-Land appealed to this court.

Our inclination to reverse the district court and remand the case with instructions to set aside the Secretary's determination and accord the appellant an evidentiary hearing under statute requires us to first pass upon the issue of whether Sea-Land initially possessed the requisite standing to be afforded a hearing under section 605(c).

■ The Secretary argues that Sea-Land is without standing in this court because it was accorded full consideration of its contentions before the Secretary's Maritime Subsidy Board and Maritime Administration. The Secretary's argument basically is that the word "hearing" does not necessarily embody only a concept of public trial-type hearing but also encompasses the procedure of administrative determination on the merits of a petitioner's papers. The Secretary says that "hearing" means "the right to support [one's] allegation by argument, however brief, and, if need be, by proof however informal." Londoner v. City & County of Denver, 210 U.S. 373, 386, 28 S.Ct. 708, 714, 52 L.Ed. 1103 (1908). We agree with this statement. However, a hearing is a hearing, is a hearing; and for a "hearing" to pass muster in this court, it must be impeccably dressed with fairness.

■ As the Secretary has noted, in making determinations with regard to section 605(c) "[u]nder our system of law and concepts of fairness, the Congress would not have acted and would not want us to act without giving the interested parties notice of the proposed action and an opportunity to be heard on the specific issues." American President Lines, Ltd.-Atlantic Straits Service, 1

M.S.B. 143 (1963). On oral argument before this court, the Secretary submitted the recent case of Groendyke Transport, Inc. v. Davis, 406 F.2d 1158 (5th Cir.), cert. denied, 394 U.S. 1012, 89 S.Ct. 1628, 23 L.Ed.2d 39 (1969), for the proposition that in many cases there is no need for a full oral evidentiary hearing before due process is complied with and therefore, because its "hearing" of petitioner's claims fully considered all aspects of its argument, due process was met.[5] Our reading of *Groendyke,* however, discloses that the Fifth Circuit was of the opinion that summary disposition of cases at the judicial appellate level, while certainly the exception to the rule, is appropriate in cases either where time is of the essence and "rights delayed are rights denied," or where one party before the court is clearly entitled to judgment as a matter of law and there would be no substantial dispute as to what the outcome of the case would be. Without deciding the correctness of these positions, we do note that the instant case does not fall within either of these categories. Time, in this proceeding, was most definitely not of the essence, as that phrase is normally construed. In cases which usually take from 18 months to two years from application to reality, time is of no great concern. Also, and obviously, this case, at the administrative level, was not a case before a judicial appellate body. Those administrators do not sit in judgment on the law, but rather they sit to determine the facts relevant to a pertinent statute. To urge that they can find, as a matter of law, that one party is clearly entitled to judgment based upon opposing affidavits compiled with only 12 days notice (from August 19 to August 31) after a one-party proceeding lasting 18 months is to require this court to approve of the unfamiliar and absurd practice of unfairness. Also, aside from these considerations, standing to challenge a final order of the district court in this court has nothing to do with the merits of appellant's contentions for, by statute, they have a right to attain review of that court's order. We therefore find that, to this extent, Sea-Land has standing.

We turn now to the argument that since Sea-Land was not operating an existing service on these routes when it sought intervention below (and thus was not a "party aggrieved or affected") it does not now have standing to challenge the award.

■ Section 605(c) of the Merchant Marine Act of 1936, as amended, *supra,* calls for notice and hearing where either the proposed subsidized service is "in addition to the existing service," or where the grant of subsidy will be unduly prejudicial or advantageous on behalf of the applicant vis-á-vis the other parties serving the route. The trial court found, and the Secretary urges, that either the notice and opportunity for hearing under the application of February 24, 1964, met the statutory requirement of the application of April 7, 1965, or the latter was merely an amendment to the former and therefore no notice was required. Two things militate against this position. First, 46 C.F.R. § 201.77 (1968), relative to amendments to applications for subsidy, permits "[a]mendments * * to * * * be allowed * * * in the discretion of the [Secretary] * * * *Provided,* That after a prehearing conference has been held *no amendment shall be allowed which would substantially broaden the issues, unless an opportunity is afforded all parties to answer such amended pleadings and to prepare for hearing upon the broadened issues."* (Emphasis supplied.) Even if we treat this second application merely as an amendment to the first, we feel that the attempt on the part of Export to achieve both an operating-differential subsidy and a construction-differential subsidy for a "fully containerized service" *broadened* the issues of the first application (which had sought an operating-differential subsidy for the more conven-

---

5. *But cf.* Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (decided Apr. 29, 1969).

tional type vessels) sufficiently to require notice and opportunity for hearing to inquire into the need for such service.

■ However, we think that the application of April 7, 1965, was something more than a mere amendment to the February 24th application of a year earlier. It will be remembered that the applicant, in the later application, sought subsidy for the *"first* fully containerized steamship service in the foreign commerce of the United States," which would "offer *unprecedented* benefits," to everyone concerned. This new ("new" because what is first and unprecedented is also "new") service was to be undertaken by a *new* wholly owned subsidiary of Export which would employ *new* ships (new with respect to the trade routes in question and *new* with respect to those ships "which [were] the subject of [the February 24 application]") with certain *new* crew members, *new* equipment for loading and unloading cargo; *new* storage spaces aboard ship, carrying *new* and different types of cargo, with *new* shipping rates and bills of lading. All-in-all the contemplated service would be the *newest* service yet to be offered. This description of Export of its proposed service (found in Attachment #12) does not resemble an amendment to an application which merely requested subsidy to operate two break-bulk vessels. Apparently it did not appear as such to the Secretary either, for in its denial of Sea-Land's petition to reopen, the Board noted that "[a]fter further analysis of the situation, the Board concluded that there was no legal requirement for re-publication of [Export's] *new* application of April 7, 1965 * * * *" (Emphasis supplied; J.A. 16.) We do not feel, in construing the application of April 7, 1965 as a *new* application, that we strain the true meaning and purpose of that paper. It was a new application.

We turn then to the question of whether this new application necessitated the giving of notice and holding of hearings with regard to section 605(c). As we have said before, this section demands conformance by notice and hearing whenever the proposed service would be "in addition to the existing service" or the effect of the contract of subsidy would be unduly prejudicial to competition. Accordingly, if the proposed service was, in fact, in addition to the existing service, then it would follow that both notice and hearing were required.

■ How does one determine if the proposed service is "in addition to the existing service?" The Secretary, in its brief citing the case of Isbrandtsen Co.— Subsidy, E/B Around the World, 5 F.M.B. 448, 453 (1958), answers this question. There the Board held that "[i]n determining whether [one] is operating an 'existing service' within the meaning of section 605(c), we must look to the entire scope of the applicant's operation * * * * To qualify as an existing operator * * * [one's] service, at the time its application was filed, must have been reasonably in general accord with its proposed subsidized service." (Citation omitted.) To put it another way, where one's existing service is reasonably in general accord with its proposed subsidized service the latter will not be construed to be "in addition" to the former and notice and hearing will not be required unless the proposed service would be unduly prejudicial with respect to competitors.[6]

With the foregoing in mind, to argue that the existing service of Export on April 6, 1965, was "reasonably in accord" with its proposed "unprecedented" service of April 7, 1965, is to urge that new is reasonably in accord with old. Unable to accept that argument, we therefore hold that not only was the April 7th application a new application, but it also called for subsidy of a service that would be "in addition to the existing service," and notice and hearing were required.

6. *See also* States S.S.Co.—Subsidy, Pacific Coast/Far East, 5 F.M.B. 304, 311 (1957), cited by the Secretary.

The foregoing considerations apply even though there is some substance to the view of the intervenor and the Board that in a sense the container proposal was a replacement of the original submission that was not devoid of continuity, especially since, under modern conditions, even general shipping lines and routes see increasing use of container facilities. It may be that a different result would have been called for if the Board had made explicit findings that the subsequent proposal had little in it that was new. Of course, even such a result could rarely be accepted without a hearing, for the interested parties should have some means of convincing the Board that there is adequate service for the proposal, as revised, even though the original application was in a field that was largely without other service. If a change is to be accepted without even a notice or opportunity for hearing, the case must be one where the Board is clear, beyond dispute, that there is nothing that could reasonably be said to be new. For the sake of clarity of analysis we leave open the possibility that, in an appropriate case, the Board may dispense with a hearing and support its procedural course, by virtue of meaningful findings, based on its expertise in appraising materials in its open files, that the change introduces no material novelty. This was not done in this case, and on the record before us it seems doubtful that the Board could have made such a finding. That the change was material seems implicit in the record since apparently there was no disposition to grant a subsidy on the original submission, whereas the application, as revised, did lead to a grant.

■ Of course there may be borderline cases where even a modest improvement in shipping service offered may suffice to show that a subsidy is in the public interest. However, it is at least doubtful, on the record before us, that this change was a mere improvement in facilities and service. There are indications that there was really a significant change in the market for shipping service offered. The procedure contemplated by the statute for so consequential an administrative action, as the dispensation of public funds by grant, is that a hearing should be held rather than bypassed where there is a doubt as to the nature or impact of the change in the proposal. The presumption stands in favor of a hearing rather than the other way around. Since Sea-Land was an "interested party" to such a proposal (it was so conceded by the Secretary when it noted that it was well aware of the preparations Sea-Land was making in an effort to institute a containerized service), it, too, was entitled to notice.

■ Finally, since Congress has delegated the authority to the Secretary to pass upon applications for contracts of government subsidy, and since these grants are a part of the government wealth, it is incumbent upon the Secretary to follow sound administrative procedures to determine the necessity of expenditures and thereby serve the master, public interest. Every dollar paid to these carriers amounts to a deficit upon the books of the Secretary and the public audit requires him to justify or balance these expenditures with proper administrative proceedings. Since there was not a proper balancing under the facts of this case, we reverse the district court and remand the case with instructions to return the case to the Secretary in order to permit Sea-Land a full and fair opportunity to be heard.[7]

Reversed and remanded.

---

**7.** Subsequent to oral argument in this case, American Export Isbrandtsen Lines, Inc., filed with this court a "Suggestion of Mootness" based upon an administrative determination relating to certain collateral matters with respect to Trade Routes 5–7–8–9, to which Sea-Land Service, Inc., filed a timely reply. Upon a full review of these papers we are unconvinced that this case is mooted in the traditional sense or rendered illusory by the intervening administrative action.