**MARINE SPACE ENCLOSURES, INC.,**
Petitioner,

v.

**FEDERAL MARITIME COMMISSION**
and United States of America,
Respondents,

The City of New York, The Port Authori-
ty of New York, Greek Lines,
Inc., et al., Intervenors.

No. 22936.

United States Court of Appeals
District of Columbia Circuit.

Argued May 29, 1969.

Decided July 30, 1969.

---◆---

Mr. Joseph A. Klausner, Washington, D. C., for petitioner.

Mr. Kenneth H. Burns, Solicitor, Federal Maritime Commission, with whom Messrs. James L. Pimper, Gen. Counsel, Federal Maritime Commission, and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief, for respondents.

Mr. Patrick J. Falvey, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. J. Lee Rankin, New York City, and Sidney Goldstein, Chicago, Ill., were on the brief, for intervenors, The City of New York and The Port Authority of New York. Mr. James M. Henderson, Washington, D. C., also entered an appearance for intervenors The City of New York and The Port Authority of New York.

Mr. Marvin J. Coles, Washington, D. C., with whom Mr. Neal Michael Mayer was on the brief, for intervenor, Greek Lines, Inc., et al.

Before McGOWAN, LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

Marine Space Enclosures, Inc. (Petitioner) brings this action to review a decision and order of the Federal Maritime Commission (FMC), approving without hearing a contract for the construction and maintenance of maritime passenger terminal facilities in the port of New York City, and a companion agreement between carriers and the Port Authority for use of the terminal. We think that the Commission's failure to hold a hearing was a violation of § 15 of the Shipping Act of 1916, and remand for further proceedings.

## I. BACKGROUND AND PROCEDURES.

### A. *The proposals for a new terminal.*

On January 17, 1969, after extensive hearings before the City Council of New York, the City entered into an agreement with the Port of New York Authority (the Port Authority) authorizing the Port Authority to construct and maintain on City-owned property a new terminal to handle maritime passenger traffic. Under the agreement financing will be provided by the City and the Port Authority will lease the facility at a fixed rental, calculated to amortize the City's $60,000,000 cost over a 20-year period. The contract is subject to renewal at expiration by the Port Authority. Tariffs, which include under the contract "rates of dockage and wharfage and the amounts of passenger fees, visitors' fees and parking rates, for all users of the * * * terminal" are to be fixed by the Port Authority. The only limitation placed on the Port Authority is that tariffs be maintained "having due regard to estimated maintenance and operating costs, and to increases thereof which may be occasioned by the passage of time and the aging of the facility." [1]

The agreement also establishes an "interim" arrangement whereby, pending completion of the new proposed facilities, the City will turn over to the Port Authority certain piers and docks in Manhattan which are presently used for maritime passenger traffic. Existing leases with private operators for the maintenance of these piers will be terminated, or negotiated release obtained, wherever possible.

Implementing the basic arrangement are certain restrictive covenants, covering the term for both interim and permanent operations, which are the focus of this controversy. First, the contract provides that neither the City nor the Port Authority will "promote, finance, establish, construct, operate, or maintain

[1.] As provided in the companion contract, to which all carriers wishing to use the new facility must subscribe, the charges for using the terminal are not to exceed twenty dollars per capita.

any pier, wharf, bulkhead, dock, terminal or other facilities for the accommodation of passenger vessels, or authorize any other person so to do [for a term] no more than fifty years after the expiration of the original term of the letting of the permanent premises." Thus there is provided a restraint lasting in excess of 70 years.[2] A separate restriction precludes construction or effective maintenance of facilities on privately owned frontage that might be suitable for a terminal.[3]

It is also provided that the agreement between the City and the Port Authority is conditioned on the separate agreement of the ship lines to use exclusively the new facility once completed, and the interim facilities in the meanwhile.[4] The clause has been given effect in a contract, which is also before the FMC, wherein the signatory carriers agree with the Port Authority to "undertake, from the date of the commencement of the letting under the Basic Agreement, to operate all their passenger vessel service to and from the Port of New York * * * only to and from the Interim Terminal * * * and upon completion of the construction, to and from the Permanent Terminal only." Under the

agreement with the subscribing carriers the City and Port Authority promise not to allow non-signatory carriers to use the Interim or permanent facilities. The term of this agreement is coextensive with the 70-year term of the Basic Agreement. Six carriers have thus far subscribed to the agreement.

### B. *Proceedings before the Commission.*

In accordance with § 15 of the Shipping Act of 1916, the City's and Port Authority's plans and the two proposed agreements were filed with the FMC for approval and on February 28, 1969, the Commission noticed the matter in the Federal Register and invited comments or requests for a hearing.[5] Petitioner, Marine Space Enclosure, identifying itself as interested in operation of a different terminal, filed a timely response on March 11, 1969, protesting the anticompetitive features of the two contracts, which, it contended, constituted a prima facie contravention of the "public interest" under applicable case law. The protest urged disapproval of the arrangement, or that, at the very least, a hearing be scheduled.

2. The term of letting for the permanent facility commences the first day in the first calendar month after a specified portion of the new terminal is certified as completed, and runs for a period of twenty years. The agreement provides that the commencement date shall, in any event, begin not later than forty-eight months after the letting of the interim premises.

3. The agreement provides that "neither the City nor the Port Authority will issue any work permit or other construction approval or consent whereby structures suitable for [passenger terminal] operations may be provided whether by alteration of existing structures, or by new construction, anywhere within the jurisdiction of the City or Port Authority." The Port Authority further agrees under the contract to reimburse the City for any damages incurred by virtue of honoring this covenant.

4. Paragraph (c) of section 31 provides: This agreement shall not be effective

unless prior to the commencement of the letting a companion agreement is made among the Port Authority, the City and those steamship operators presently intending to use the facility, which shall contain a provision that neither the Port Authority nor the City will permit use of any properties under its jurisdiction or operated by it for the handling of passenger vessels for marine terminal operation. * * * Such companion agreement shall contain further an undertaking by the various steamship operators to operate no passenger vessels to any terminal or stopping place in the Port of New York other than the interim premises during the term of the letting thereof hereunder, or other than the marine terminal during its operation.

5. The notice appears at 34 Fed.Reg. 3639 and gave interested parties twelve days (until March 12) in which to respond. We think this is inadequate, a point to which we return in Part III, *infra.*

By way of answer the City and Port Authority defended the agreements on the grounds that the plans for the proposed terminal had been the subject of public hearings before the City Council of New York; that new facilities were urgently needed and that a hearing before the Commission would cause unnecessary and critical delay; and that the restrictive provisions of the two agreements did not preclude construction and maintenance of terminal facilities on property not controlled by or under the jurisdiction of the City or Port Authority; [6] and finally, that no carrier had intervened or protested before the Commission.

Supplemental papers were subsequently lodged by both the petitioner and terminal proponents, including correspondence between the Port Authority and several carriers, indicating that carrier approval of the plan was not without some reservations, a fact stressed by petitioner in its supplemental protest.

On April 7, 1969, based on this skeleton record,[7] the Commission issued a memorandum Order of Approval. The FMC found, in conclusory terms, that there was a "demonstrated need" for the agreements and that they were not "unjustly discriminatory or unfair or detrimental to the Commerce of the United States and are not contrary to the public interest." Petitioner's protest was dismissed on the ground that Marine Space Enclosures had only an "indirect and remote interest." Noting, however, that

the contract provisions were "unique" and had "especially anticompetitive character and effect," the Commission asserted continuing jurisdiction "to cancel or modify" the agreements and to monitor operations by requiring reports from the Port Authority.

C. *Developments subsequent to the FMC's decision.*[8]

Subsequent to the April 7 Order of Approval the Commission received requests from several carriers for further informal discussion of the proposals for the new terminal. In a supplemental order of May 12, the Commission discounted the significance of this request which it noted did not amount to a formal protest. The April 7 order was reaffirmed, relying on the stipulation of the City and Port Authority to resubmit the agreements for approval at the end of the amortization period. On May 14, the carriers applied to this court for leave to intervene and their motion was granted by an order of May 29.[9]

## II. REQUIREMENT OF HEARING PRIOR TO APPROVAL OF AGREEMENTS UNDER SECTION 15.

A. *The hearing requirement of § 15.*

We think the mandate of Congress was violated when the Commission failed to hold a hearing on petitioner's objections to the contracts for development and use of the planned Port Authority terminal.

6. The record does not indicate the extent of the Port Authority's jurisdiction on the Jersey side of the Hudson. The Authority is a body created by interstate compact for the promotion and management and coordination of interstate traffic through New York harbor. Its other functions would not appear relevant to this controversy.

7. The Commission's Order notes that comments were received from several other interested groups, but these comments have not been incorporated in the Joint Appendix.

8. Prior to oral argument respondents filed a motion with this court for permission to supply a joint appendix containing

documents and an order filed after the Commission's April 7 decision in this case. That motion is hereby granted. A motion was also filed by the petitioner moving to strike certain portions of the Port Authority's (intervenor's) brief. That motion is denied.

9. The telegram to the Commission requesting further consultation was signed by Canadian Pacific Steamships, Greek Line, Home Line, Chandris Line, Ingres Lines, North German Lloyd. Victoria Steamship Co. has also intervened before this court. These six lines estimate, according to their motion papers and their brief, that they carry about 40% of the passengers using the New York City port facilities.

This conclusion appears from the plain language of § 15 of the Shipping Act of 1916, which required the Port Authority to file the two agreements with the FMC for approval, and further directed:

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations.[10]

The vitality of this statutory directive is underscored by two recent decisions of the Supreme Court. In FMC v. Svenska Amerika Linien, 390 U.S. 238, 244, 88 S.Ct. 1005, 1009, 19 L.Ed.2d 1071 (1968), the Court approved the FMC's policy of shifting to an applicant for approval of a restrictive agreement the burden of demonstrating the need for anticompetitive restraints, noting "By its very nature an illegal restraint of trade is in some ways 'contrary to the public interest.'" In Volkswagenwerk Aktiengessellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), the Court disapproved the Commission's failure to require the filing of certain agreements and to give them active consideration for approval or rejection, even though the restraints were only incidental to a management-labor pact designed to avoid impediments to commerce.[11]

A quick and over-literal reading of § 15 might generate the notion that a hearing is required only if the Commission disapproves an agreement and not if the Commission merely grants approval. In all fairness to counsel, this thought, if put forward at all by the Commission, was suggested only softly, as a backdrop for other sturdier contentions.

■■ Section 15 requires an affirmative act of approval.[12] The significance of this is undeniable. On the one hand, it is unlawful to act in pursuance of the agreement prior to receipt of approval. On the other hand, the Commission's imprimatur, when received, carries with it immunity from the antitrust laws.[13] It would be a travesty to suppose that Con-

---

10. 46 U.S.C. § 814 (1964). Petitioner also relies on section 16, First, which provides in part:

It shall be unlawful for any * * * person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—
First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

11. The Court analyzed the legislative history of § 15 and concluded that "While it is true that the attention of that congressional committee [that originally investigated anticompetitive practices in shipping] was focused primarily upon the practices that had cartelized much of the maritime industry, it is clear that the concern of its inquiry were far more broadly ranging." 390 U.S. at 275, 88 S.Ct. at 937. The Court further noted that "Nothing in the legislative history suggests that Congress, in enacting § 15, meant to do less than * * * subject to the scrutiny of a specialized government agency the myriad of restrictive agreements in the maritime industry." Id. at 276, 88 S.Ct. at 937.

12. "Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission * * *." 46 U.S.C. § 814.

13. "Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto." 46 U.S.C. § 814 (1964).

gress meticulously required an appropri- ate hearing and reasoned disposition as a condition of disapproval of industry agreements but was prepared to acquiesce in agency approval on the basis of back-office and one-sided conversations, and unpublished disposition unaccompanied by reasoned analysis and opportunity for appropriate presentation of objection, evidence and argument. What the words of § 15 fairly indicate is that an appropriate hearing shall be held prior to either approval or disapproval.

### B. *Inapplicability of implied exceptions from the hearing requirement.*

There may be an implied exception to the literal command of section 15 when the Commission has made appropriate determination that certain agreements are of purely routine nature or have an impact on commerce that the Commission finds is *de minimis*.[14]

 However, the matter before us is not appropriate for establishing any implied exception to section 15. To begin with, there is no Commission rule announcing an exemption for the agreements involved.[15] These agreements are neither routine nor *de minimis*. They plainly have a significant impact on maritime commerce. The seventy-year

restriction affecting over-all steamship passenger traffic to the Port of New York is anything but routine. The Commission, by its own Order, characterized these restrictions as "unique" and highly anticompetitive in nature.

### III. SUFFICIENCY OF THE PLEADINGS TO ACTIVATE HEARING REQUIREMENT.

Even if it be assumed that a new passenger terminal is required, it is by no means plain that these particular and extensive restrictions are necessary. The lease and the exclusive dealing arrangement, exacted from the carriers as a price for using the new facility, extend fifty years beyond the term needed to amortize the original capital investment by the City (assuming the terminal proves viable). The arrangement covers all property, private and public, that would be suitable for a new terminal, and the restrictions cover all five New York City boroughs.[16] The agreements thus amount to a significant and perhaps total barrier to entry for the next seventy years.

The seriousness of such all-inclusive restraints of this duration is clear not only in terms of general antitrust doctrine,[17] but also under the FMC's own rulings considering the impact of restraints in the maritime industry.[18] It

---

14. See *Volkswagenwerk*, 390 U.S. at 276, 88 S.Ct. at 938, where the Court said: "This is not to say that the Commission is without power to determine, after appropriate administrative proceedings, that some types or classes of agreements coming within the literal provisions of § 15 are of such a *de minimis* or routine character as not to require formal filing." Such agreements would also be exempt from the hearing requirement of § 15.

15. 46 U.S.C. § 833a (1964).

16. The restrictions might also cover part of the Jersey area, to the extent of Port Authority jurisdiction. This point, which could have developed had the Commission held a hearing or received affidavits, is critical to the determination of what constitutes the "relevant market" and how much of it is foreclosed from competition. We do not see how the Commission could

have reached an intelligent evaluation of the public interest in this case without ascertaining how much market foreclosure is being conceded to obtain the advantages of a new terminal in Manhattan, assuming the necessity of a new terminal and the need for some assured patronage for it. *Compare* Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 81 S. Ct. 623, 5 L.Ed.2d 580 (1961).

17. *See, e. g.,* Tampa Elec. Co. v. Nashville Coal Co., *supra* note 16.

18. *Compare* the Commission's decision in Investigation of Passenger Steamship Conferences Regarding Travel Agents, 10 F.M.C. 27 (1966), where the Commission expressly noted the importance of examining the impact of tying and exclusive dealing agreements on non-participating groups and companies, and invalidated the arrangements before it on the ground that

is, to say the least, surprising that the Commission would depart from its own prior decisions whether they be treated as having precedential quality or merely the signposts of reflective past determinations, and would approve such restrictions without even briefs and argument, and without discussing what points might further require an evidentiary hearing. It is surprising to the point of concern that the Commission would make such a departure in an opinion that offers the sparsest of findings and speaks in the most conclusory terms.[19]

■ An agency may modify or even reverse its past policies and announcements,[20] but the confidence of a reviewing court that these adjustments are made in accordance with the requirements of law is not enhanced when the prior precedents are not discussed, the

swerves and reversals are not identified, and the entire matter is brushed off once over lightly.

■■ Antitrust questions in general, and in particular contracts involving such all-encompassing restraints, present issues of the kind that should be explored sua sponte in order to discharge an agency's "active and independent duty to guard the public interest," and if need be, the Commission should order a hearing to ascertain whether there exist "alternative courses, other than those suggested by the applicant." [21] This is responsive to the dominant consideration that anticompetitive restraints, the kind that would be illegal or of doubtful legality if used in unregulated industry, are in some ways contrary to the public interest that shapes rules governing the persons in directly regulated industry.[22]

they were broader than necessary. *Compare also* the Commission's approach in Agreement No. T–1768—Terminal Lease Agreement, 9 F.M.C. 202 (1966), where it was noted that an important aspect of any agreement for the use of terminal facilities is the question of whether traffic will be diverted from a port. 9 F.M.C. at 205.

19. *Compare* Sea-Land Serv., Inc. v. Conner, 135 U.S.App.D.C. 306, 418 F.2d 1142 (June 4, 1969). In reversing an order of the Maritime Subsidy Board for failing to hold a hearing on whether container ships constitute a "new service" as opposed to break bulk carriage we noted that on a threshhold point like this, one that involves a great deal of expertise, "It may be that a different result would have been called for if the Board had made explicit findings that the subsequent proposal [the proposal for a container service] had little in it that was new. Of course, even such a result could rarely be accepted without a hearing, for the interested parties should have some means of convincing the Board that there is adequate service * * *. For the sake of clarity of analysis we leave open the possibility that, in an appropriate case, the Board may dispense with a hearing and support its procedural course, by virtue of meaningful findings, based on its expertise in appraising materials in its open files, that the change introduces no material novelty." 135 U.S.App.D.C. at 313, 418 F.2d at 1149.

20. *See, e. g.,* Atlantic Seaboard Corp. v. FPC, 131 U.S.App.D.C. 291, 404 F.2d 1268, 1273 (1968).

21. *See* Citizens For Allegan County v. FPC, 134 U.S.App.D.C. 229, p. 237, 414 F.2d 1125, p. 1133 (April 29, 1969) ; *compare* United States v. Third Nat'l Bank in Nashville, 390 U.S. 171, 189, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968).

22. *See, e. g.,* FMC v. Svenska Amerika Linien, 390 U.S. 238, 244, 88 S.Ct. 1005, 1009, 19 L.Ed.2d 1071 (1968), where the Court noted that "By its very nature an illegal restraint of trade is in some ways 'contrary to the public interest.'" See also McLean Trucking Co. v. United States, 321 U.S. 67, 79–80, 64 S.Ct. 370, 88 L.Ed. 544 (1944). In *McLean* the Court outlined the administrative obligation to harmonize competing public policies and stressed the importance of looking beyond the immediate regulatory task set forth in an administrative statute. (O. 79–80, 64 S.Ct. 377) :

The Commission's task is to enforce [the basic regulatory statute] and other legislation which deals specifically with transportation facilities and problems. That legislation [the Interstate Commerce Act in this case] constitutes the immediate frame of reference within which the Commission operates; and the policies expressed in it must be the basic determinants of its action.

But in executing those policies the Commission may be faced with overlap-

The importance of adherence to the "fundamental policies" of the antitrust laws [23] is undeniable. We need not consider whether or to what exent they may in some cases permit relaxation of customary requirements of the adversarial process in order to ensure the surveillance contemplated by law.[24] Certainly consideration of antitrust issues is required in this case, where they were timely raised by petitioner's protest, albeit in general terms. The Commission cannot fairly say it was in no wise alerted to the magnitude of the problems—for when the issue fairly clamors for attention, even a gentle reminder speaks loud enough for the agency conscientiously discharging its duty. Here the protest was more than a diffident clearing of the throat; it noted the extent and duration of the restrictions,[25] and specifically reminded the Commission of the Supreme Court's philosophy set forth in FMC v. Svenska Linien (see supra note 22).[26]

ping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view. When this is true, it cannot, without more ignore the latter.

Procedural requirements depend in part on the importance of the issues before the agency; see Citizens for Allegan County v. FPC, supra note 21; American Airlines v. CAB, 123 U.S.App.D.C. 310, 317, 359 F.2d 624, 631, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966) (controversial regulations governing competitive practices); Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608, 620 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), where the court related the scope of the regulatory obligation to the importance of petitioner's substantive contentions, noting the importance of entertaining all relevant testimony and argument in a case where "public interest and concern is so great." Cf. Northern Nat. Gas Co. v. FPC, 130 U.S. App.D.C. 220, 399 F.2d 953 (1968); WAIT Radio v. F.C.C., 135 U.S.App.D.C. 317, 418 F.2d 1153 (June 25, 1969); Joseph v. FCC, 131 U.S.App.D.C. 207, 404 F.2d 207 (1968).

23. See Carnation Co. v. Pacific Westbound Conf., 383 U.S. 213, 218 (1966), where the Supreme Court characterized antitrust principles as "a fundamental national economic policy." See also Pacific Seafarers, Inc. v. Pacific Far East Lines, 131 U.S.App.D.C. 226, 404 F.2d 804 (1968), cert. denied, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969); Perma Life Mufflers v. Int'l Parts, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (overriding public policy in favor of competition).

24. Compare Utah Pub. Serv. Comm'n v. El Paso Nat. Gas Co., 395 U.S. 464, 89 S.Ct. 1860, 23 L.Ed. 474 (June 16, 1969). Compare also majority and concurring opinions in Wilson v. FCC, 130 U.S.App. D.C. 156, 397 F.2d 717, 722 (1968).

25. Petitioner protested:

In the present case, the terms of the agreements erect a classical restraint of trade in a peculiarly pernicious form: no one is to be allowed to construct independent terminals; there is to be one terminal only, to be leased to one operator only, to the exclusion of all competitors, existing or potential; carriers are to be dragooned not merely by physical fact that there will be no other terminal, but by an explicit promise of 70 years' exclusive patronage on pain of being precluded from that unique facility.

26. In some situations more may be required of a party. Compare American Airlines, Inc. v. CAB, 123 U.S.App.D.C. at 318–319, 359 F.2d at 632–633, supra note 22, where we said: " * * * there is no basis on the present record for concluding that additional procedures were requisite for fair hearing. * * * Nowhere in the record is there any specific proffer by petitioners as to the subjects they believe required oral hearing, what kind of facts they proposed to adduce, and by what witnesses, etc. Nor was there any specific proffer as to particular lines of cross-examination which required exploration at an oral hearing." American Airlines involved a rule-making proceeding in conformity with the procedures prescribed by § 4 of the APA.

Compare also WAIT Radio v. FCC, supra note 22; Rio Grande Family Radio Fellowship, Inc. v. FCC, 132 U.S. App.D.C. 128, 406 F.2d 664 (1968), considering the specificity of pleading required to obtain a hearing on a waiver application. In WAIT we held that the administrative obligation is related both to the adequacy of the pleading and the substantiality of an applicant's substantive contentions.

Here, however, we have under consideration an administrative action that is

Considering the nature and gravity of the issues, petitioner's protest was sufficient to alert the Commission to the need for further inquiry.

■ Petitioner's failure to develop in detail controverted factual issues is excusable since the Federal Register notice called only for "comments with reference to an agreement including a request for hearing, if desired, [to be] submitted within 12 days after publication of this notice. * * *" (34 Fed.Reg. 3639, Feb. 28, 1969.) The brief time span allotted must also be taken into account.[27]

■ If, after receiving petitioner's protest, the Commission still deemed a hearing unnecessary, it should have, at the very least, afforded interested parties an opportunity to submit affidavits and an outline of controverted issues that could be profitably explored in an evidentiary hearing.[28]

## IV. COMMISSION'S PUBLIC INTEREST CONTENTIONS DO NOT OBVIATE HEARING REQUIREMENT.

The Commission's brief on appeal emphasizes the urgent need for a new terminal, and contends that the retention of jurisdiction, formalized by the agreement of the parties, adequately protects the public interest.

We have already indicated reservations about the soundness of the Commission's bare and unsupported conclusions, that a new facility was needed in New York, and urgently so. The discussion is couched in conclusory terms without any support of record.[29] The Commission apparently relies on views of passenger lines, labor groups and other interested bodies that appeared at the public hearings before the New York City Council, none of which is in the record before

---

mandated for hearing by § 15 of the Shipping Act. The burden is not on the person who wants an unusual hearing (as in the case of rule-making, or waiver) but on the agency desiring the unusual dispensation from hearing.

27. Twelve days is skimpy, to say the least, if intended to include time required to sift through papers, consult clients, co-ordinate with other interested parties, research points of law, and put together documentary evidence. The Commission contends that time was of the essence. We do not think it necessarily impermissible to notice the matter for responsive filing in twelve days, in order to obtain preliminary views. If no protest is filed, or if no substantial issues are raised it may then be proper for the Commission to proceed and approve the agreements. Here the initial papers exposed issues of substance, issues of such obvious gravity that the Commission should not in any event need prompting from private parties before it holds a hearing.

28. In Persian Gulf Outward Freight Conf. v. FMC, 126 U.S.App.D.C. 159, 165 n. 4, 375 F.2d 335, 341 n. 4 (1967), this court urged the Commission to invite the submission of affidavits even when it thought them unnecessary. We said: "Even if the Commission believes that there are no issues of fact in a case, we believe that it would be better advised to be consistent in allowing parties an opportunity

to file affidavits of fact in every case. Certainly much of the controversy in this case would have been foreshortened had petitioner had such opportunity. Moreover, such procedure would afford appellate courts a better record against which to evaluate the contentions of the parties."

In *Persian Gulf* we affirmed the FMC's decision and order, but there the Commission heard oral argument and received formal and complete memoranda of law from the parties. This procedure not only assured adequate consideration of those issues involving questions of law, but also afforded, it may be assumed, opportunity to develop discussions of what have been sometimes referred to as mixed questions of law and fact, and to identify the existence and significance of factual issues for which an evidentiary hearing could be sought as necessary law.

29. The Commission's opinion states:
The Commission has reviewed the agreements, protests and other comments [apparently not incorporated into the record] and is of the opinion that the agreements should be approved. Proponents have demonstrated a transportation need for the agreements and it would appear that the agreements are not unjustly discriminatory or unfair or detrimental to the commerce of the United States and are not contrary to the public interest.

this court.[30] The Commission then went on to say:

> We are persuaded that these factors [the dilapidated state of the passenger facilities in New York harbor, the favorable comment before the City Council, and absence of carrier protest] demonstrate that the agreements encompass sufficient transportation benefits in the public interest to warrant their approval. In fact, the transportation need is so clear we consider it essential that the project be permitted to be initiated as soon as possible.

 These recitations are ample in rhetoric, but "sparing in detail." [31] They are without support in the record, save for the Port Authority's bare assertion that "a hearing would only result in critical delay of an urgently needed terminal facility." We do not think that the Commission's discussion meets the "burden of justification resting on the Commission * * * in a case like this where the agency not only failed to notice an evidentiary hearing, but disposed of the matter without even brief or argument from the petitioner." Citizens for

Allegan County v. FPC *supra* note 21, 134 U.S.App.D.C. p. 233, 414 F.2d 1129.[32] Such terse and summary treatment is even more inappropriate for the disposition of antitrust issues.[33]

 If time was of the essence, the appropriate solution was not to bypass entirely the statutory requirement of hearing, but to structure an expedited hearing.[34] The Commission erred if it supposed that the defect was rescued by its retention of jurisdiction. This approach ignores the realities confronting carriers like intervenors, who were compelled in effect to reroute their voyages on short notice or subscribe to the seventy-year agreement in order to use the Interim facilities.

 We have taken into account the Commission's insertion on rehearing, apparently at the prodding of the Justice Department, of an express provision in its order retaining jurisdiction to consider any application filed 20 years hence to build or operate new terminals. This is not wholly without significance, but it is too flimsy to bear the weight now being thrust on it by counsel as a provision

---

30. Neither the findings of the City Council nor the "comments" alluded to in the Commission's opinion, have been included in the appendix. As appears from the supplementary record lodged in this action, the Commission at the time of decision had on file, in addition to petitioner's papers two brochures describing the present terminal arrangements in New York City, analysing the present and projected maritime passenger traffic patterns through the port, and outlining the plan and projected cost for the new facilities. These studies, prepared by the Port Authority, do not contain or represent the views of the carriers. The only indication in the record that the carriers favored the terminal project is the assertion by the Port Authority in its answer to petitioner's protest. If anything, the record suggests a reluctance by the carriers to participate in the new arrangement. If carrier participation is only nominal, there may be some doubt as to how crucial the need is for new facilities, at least on the terms proposed in these two agreements.

31. *See* United States Atlantic & Gulf/Australia-New Zealand Conf. v. FMC, 124

U.S.App.D.C. 303, 364 F.2d 696, 699 (1966).

32. *See also* Sea Land Serv., Inc. v. Connor, *supra* note 19.

33. *Compare* Northern Nat. Gas v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968).

34. Assuming that "urgency" can be taken into account under § 15, this does not appear to be the kind of "exigent circumstances" that necessitate immediate administrative action. *Compare* North Ameri-Cold Storage Co. v. Chicago, 211 U.S. 306, 319–320, 29 S.Ct. 101, 53 L.Ed. 195 (1908). In Community Broadcasting Co. v. FCC, 107 U.S.App.D.C. 95, 274 F.2d 753 (1960) we recognized the delay attendant on holding evidentiary hearings but refused to permit the FCC to issue temporary broadcast permits, subject to later review in a hearing, except when special circumstances, which the Commission must spell out with particularity, indicate that the public interest would be served by an immediate grant of a license.

that is decisive assurance of safeguard of the public interest. The provision does not remove the barrier to a new entrant into terminal service interposed by the fact that such entrant would have to induce transportation companies to invest time and energy in exploring a proposal that would require them to move in contravention of their agreement as written. And if the interim exclusion is a restraint going beyond the necessities of the case, the retention of jurisdiction could not undo the consequences of twenty years of complete market foreclosure and the vested interests and relationships that will inevitably develop. Compare Community Broadcasting Co. v. FCC, 107 U.S.App.D.C. 95, 274 F.2d 753 (1960).[35]

## V. SCOPE OF REMAND.

We turn now to the question of what course should be followed on remand. The requirement of a hearing in a proceeding before an administrative agency may be satisfied by something less time-consuming than courtroom drama. In some cases briefs and oral argument may suffice for disposition.[36] Ordinarily, however, antitrust issues do not lend themselves to disposition solely on briefs and argument.[37] Even though there may be no disputed "adjudicatory" facts,[38] the application of the law to the underlying facts involves the kind of judgment that benefits from ventilation at a formal hearing. In some cases, however, the public hearing may usefully

---

**35.** The Commission and Port Authority, as intervenor, rely heavily on our decision in Citizens for Allegan County v. FPC, *supra* note 21 as authority for the Commission's summary disposition. *Allegan* involved the sale of power facilities owned and operated by the county to a public utility which would interconnect the Allegan facilities with a regional power system. The terms of the divestiture were approved by county referendum. We held that in light of citizen approval and in the absence of blatant irregularity, the Commission could proceed without making an independent inquiry as to whether the sale and the terms of the sale were in the public interest, at least from the point of view of the county. These, we reasoned, were essentially matters of local concern and the Commission could properly defer to voter choice. The Port Authority argues that the proposed agreements and the plans for the new terminal were considered and favorably received at a hearing before the City Council of New York. These hearings were not incorporated in the record before the Commission and more importantly, in this case the public interest considerations under § 15 involve questions of national concern where local preference is not controlling.

**36.** Whether brief and oral argument are sufficient depends on the nature of the issues. There is more need for an evidentiary hearing when there are underlying questions of fact. The kind of procedure that is appropriate may turn on whether the issue is one that involves a technical judgment, *see* Sea Land Serv.,

Inc. v. Connor, *supra* note 19, and the importance of the underlying substantive issue. *Compare* Joseph v. FCC, 131 U.S. App.D.C. 207, 404 F.2d 207 (1968); American Airlines, Inc. v. CAB, *supra* note 22. For cases approving disposition without evidentiary hearing, see Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958); Citizens For Allegan County v. FPC, *supra* note 21; Persian Gulf Outward Freight Conf. v. FMC, 126 U.S.App.D.C. 159, 164–165, 375 F.2d 335, 340–341 (1967); City of Los Angeles v. FMC, 128 U.S. App.D.C. 326, 388 F.2d 582 (1967); American Export & Isbrandtsen Lines v. FMC, 334 F.2d 185, 194 (9th Cir. 1964); cf. Groendyke Transport, Inc. v. Davis, 406 F.2d 1158 (5th Cir., Jan. 2, 1969); American Airlines, Inc. v. CAB, *supra.*

**37.** White Motor Co. v. United States, 372 U.S. 253, 263–264, 83 S.Ct. 696, 9 L.Ed. 2d 738 (1963). *See also* Fortner Enterprises v. United States Steel Co., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

**38.** *See* 1 K. Davis, Administrative Law § 7.02, at 413 (1958). Some of the questions that may arise on remand might well be characterized as adjudicatory facts; for example, whether the carriers will subscribe to the new facilities, how much business will be diverted from New York, what is the closest alternative site in New Jersey where a private terminal could be erected. Would it be competitive in terms of location?

approach the legislative rather than the adjudicatory model.[39]

■ At a public hearing the parties could focus on whether a new terminal is, in fact, needed and whether a seventy-year exclusive dealing arrangement is necessary to provide for return of capital and maintenance costs; whether the carriers will, in fact, use the terminal and whether, if there is resistance to the plan, traffic will be diverted from New York, and to what extent; whether it is feasible to reduce the restraints proposed by projecting a smaller terminal providing high-quality facilities for part of the traffic, yet leaving carriers free to employ more modest private port terminal facilities. These matters are of the kind we have referred to as "questions of public interest * * * [that] will often be illuminated by an exploration in greater depth than can be provided simply by pleadings and documents." Citizens for Allegan County v. FPC, *supra* note 21, 134 U.S.App.D.C. p. 233, 414 F.2d p. 1129.

The requirement of an evidentiary hearing is not a mandate of a prolix procedure protracted beyond endurance and beyond the requirements of the issues. Even in the most formal proceedings a capable hearing officer can evolve techniques that both expedite the proceeding and illuminate the issues.[40]

■ Notwithstanding these considerations, we refrain at this juncture from specifying that our remand order requires an evidentiary hearing. It may be, as the Commission said in its original order, that there is a pressing and urgent need for new facilities, even assuming that the contours of the problem may be redefined and adjustments made. It may

be that the issues can be adequately developed for Commission determination through receipt of documents and sworn statements, and hearing oral argument. Any evidentiary hearing may be limited to certain specific issues. These procedures, however, represent the very minimum requisite to satisfy the hearing requirements of § 15 when approval is sought for agreements which contain restrictions that are, in the Commission's words, of such "unique" and of "especially anticompetitive character."

## VI. STANDING.

We turn now to the Commission's standing contention that petitioner lacks standing to request a hearing under § 15. Marine Space Enclosures is a New York corporation engaged in real estate development. Among its contemplated projects is a terminal complex that will combine berthing facilities for passenger ships with on-shore conveniences for travelers, including hotel accommodations, etc. In the protest petitioner asserted that "planning officials of New York have expressed in writing enthusiastic interest in these plans, and preliminary consultations have begun."

■ The standing of a potential enterprise to object to agency action may be subject to skeptical inquiry when the action is of a type that increases competition.[41] Petitioner's standing as a competitor, however, is established not only by its interests as a potential competitor, but by the nexus between that interest and the substantive objection that an order approving the agreements would not be in the public interest because of the way it operates to foreclose competi-

---

39. *See* American Airlines, Inc. v. CAB, *supra* note 22.

40. Leventhal, Reviewing the Permian Basin Area Gas Price Hearings, Public Utilities Fortnightly (March 12, 1964); *see* American Airlines, Inc. v. CAB, *supra* note 22.

41. Fugazy Travel Bureau, Inc. v. CAB, 121 U.S.App.D.C. 335, 350 F.2d 733 (1965), cited by the Commission, is thus

inapposite. There petitioners sought a hearing, although none was mandated by statute, to determine whether the CAB had acted consistently with the public interest in approving agreements among the airlines that would require travel agents collecting airfares to remit proceeds three times instead of once a month. We pointed out that petitioner's economic injury, if any, stemmed from the additional competition that might ensue.

tion.[42] Even a potential competitor has standing to present non-frivolous claims of undue restraint on future competition, and certainly the seventy-year agreements contemplating a monopoly raise questions that are far from frivolous. We must respect fully the standing requirements that insist on the kind of opposition of interests establishing a case or controversy. But we must be on guard lest the kind of depreciation of a competitor's standing, which evolved at common law in turning aside objections protesting against competition, should be applied mechanically and mistakenly in the direction of turning aside objections that are intended to preserve and enlarge competition. Standing of potential competitors is implicit. A major consideration of antitrust policy is preservation of potential market.[43]

This conclusion is fortified by the policy established by legislative enactment and extended by judicial doctrine, of vindicating antitrust legislation through private actions. In Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Supreme Court overturned a decision that barred a private treble damage action based on the plaintiff's "dirty hands," saying that "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." 392 U.S. at 139, 88 S.Ct. at 1984. *See also* Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 502, 89 S.Ct. 1252 (1969). Likewise in administrative proceedings "private citizens play a role in the effectuation of our national antitrust policy." City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 126, 237 F.2d 741, 754 (1956). The pennant of "private attorney general," which may be hoisted by anyone with an economic stake who desires to signal issues of public interest, may be run to the very pinnacle of the mast in order to alert all concerned to storm signals of anticompetitive restraints.

The Commission took the position that petitioner's "particular interests * * * appear to be indirect and remote." The Commission also supports its position by the action taken by the City Council, pointing out that historically terminal facilities have been publicly managed in New York, that the Port Authority is the logical choice to construct and operate new facilities, and that the City, the owner of the property, has not seen fit to negotiate with petitioner for the use of the new proposed terminal site.

 None of these observations about the City and Port Authority supports the view that petitioner is somehow to be ignored because its interest is "indirect." As long as a petitioner is not outside the class Congress desired to protect from unlawful action, there seems little value in exploring the semantic question whether the law's shield is a safeguard against "direct" or "indirect" injury. And potential competitors are among the beneficiaries of the antitrust laws.

 A different kind of consideration is presented by the problem of remoteness. When economic capability is frivolous, standing is not to be acquired merely by plucking from the air the bare label of potential competitor. However, even an interest that falls short of legal standing may serve to awaken the agency's function of acting in the public interest by getting answers to worthwhile questions. And in the case before us the petitioner has enough support from persons who seem to be responsible business men to avoid dismissal on the ground

---

42. That is the underlying substantive objection, though the immediate ground of protest and appeal to this court is the failure to provide the kind of hearing contemplated by the statute for the delineation and attentive consideration of that objection.

43. *See e. g.*, Tampa Elec. Co. v. Nashville Coal Co., *supra* note 16; International Salt Co. v. United States, 332 U.S. 392, 398, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

that its interest is all gauze and no substance.

Counsel for the Port Authority refer to petitioner's proposed terminal venture as merely the dream of a real estate promoter, a dream supported only by the presentation of what is called a "rendering." We cannot say, and we do not see how on this record the Commission could say, whether it was a mere fantasy or whether it represented an advance in terminal planning. Petitioner has taken some step toward formulating its project, and making a forward presentation that embodies thought and reflection. Its development has been sufficient to preclude dispensation with the hearing required by statute, a hearing wherein the Commission can consider whether all restrictions contained in the proposed agreements were necessary and consistent with the public interest.

It may be that to raise a different issue we would require a different interest to support standing. Here there is, as already discussed, a nexus between the interest and the objection. We revert again to the all-encompassing covenants contained in these agreements, terms which would abort petitioner's program and block the very conception of other possibilities of a competing facility. And all this would be accomplished by agreements with the subscribing carriers that had received Commission approval and hence were insulated from the usual antitrust remedies.[44] In view of the questions raised, the fact that serious people have come forward with a serious intention suffices for standing under § 15.

We remand for further proceedings not inconsistent with this opinion.[45]

So ordered.

---

44. As the Ninth Circuit pointed out in Matson Nav. Co. v. FMC, 405 F.2d 796, 798 (9th Cir. 1968) : " * * * if the Commission has power under § 15 to approve [an] agreement, the result would be to immunize [the agreement] under the antitrust laws and [petitioners] could never attack it in the future should injury later result."

---

45. The approach of our opinion is generally in accord with the views expressed by the First Circuit in an opinion recently called to our attention by Law Week. Trailways of New England v. CAB, 412 F.2d 926 (June 13, 1969).