UNITED STATES LINES, INC.,
Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Hapag-Lloyd A. G. et al., Intervenors.

Nos. 76–2004, 77–1470.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 14, 1978.

Decided July 28, 1978.

As Amended Aug. 25, 1978.

---

Russell T. Weil, Washington, D. C., with whom Mary L. Montgomery, Washington, D. C., was on the brief, for petitioner.

Carol J. Neustadt, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., was on the brief, for respondent Federal Maritime Commission.

Robert J. Wiggers, Atty., Dept. of Justice, Washington, D. C., with whom Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., was on the brief, for respondent United States. Barry Grossman, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent United States.

Edward Schmeltzer, Washington, D. C., with whom George J. Weiner, Washington, D. C., was on the brief, for intervenors Hapag-Lloyd A. G. et al.

Before WRIGHT, Chief Judge, and McGOWAN and ROBINSON, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

United States Lines, Inc. (USL), a common carrier, petitioned this court for review of an order of the Federal Maritime Commission (FMC) approving an amendment to a joint service agreement between two of USL's competitors. The amendment's primary effect was to permit addition of a third party to the joint service for the duration of the agreement. When the basic agreement expired five months later the Commission extended it, as amended, pending completion of an investigation and hearing as to whether the joint service authority, including new proposed amendments, should be extended for an additional five-year term. USL petitioned for review of this order as well, and the two cases were consolidated for hearing and decision.

These orders were issued by the Commission under its limited authority to grant exemption from the antitrust laws for anticompetitive agreements among ocean carriers when it is in the public interest to do so, pursuant to Section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (1970).[1] It is our view that in its order approving the initial amendment to the agreement the Commission did not adequately consider the antitrust implications of adding a third party, and that a remand of the record to the Commission for further consideration is therefore required. Part II A. In addition, we hold that the Commission improperly relied on unspecified materials known only to it and on *ex parte* contacts nowhere mentioned or recorded in the public record in reaching this decision. Part II B & C. Finally, because of our view that further Commission consideration of the initial amendment is required before we can uphold the Commission's approval, we must also remand the record on which the Commission's second decision is based, for there the FMC, without further justification for the initial amendment, extended the agreement as amended *pendente lite.*

## I. BACKGROUND

The FMC order at issue here concerns an amendment to the Euro-Pacific Joint Service Agreement. When originally established in 1971 this joint service included two parties, Hapag-Lloyd, Aktiengesellschaft,

---

1. Section 15 of the Shipping Act provides in relevant part:

 Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

 The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. * *

 \* \* \* \* \* \*

 Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation * * *.

 Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1 to 11 and 15 of Title 15, and amendments and Acts supplementary thereto.

46 U.S.C. § 814 (1970).

A.G. (Hapag-Lloyd), and Compagnie Generale Transatlantique (CGT). Soon afterward the agreement was amended to include a third line, Holland-America Line (HAL), but HAL chose to withdraw from the joint service in 1973. The agreement allowed the parties to operate a joint all-water service using conventional breakbulk vessels between the United States and the Canadian Pacific Coast and Europe. As part of this joint service the parties were permitted to agree on and fix rates, share profits and losses, rationalize services, and employ common agents, all exempted from the antitrust laws by virtue of the Commission's authority under Section 15 of the Shipping Act.

. In April 1976 Euro-Pacific applied to the FMC for approval of an amendment to its joint service agreement, the proposal being designated as Agreement No. 9902–3.[2] This amendment would permit entry of a third party, Intercontinental Transport (ICT) (successor to Holland-America Line), to the existing service, would reapportion the parties' share of expenses, profits, and losses, and would permit replacement of the breakbulk fleet with eight containerships having a capacity averaging approximately 1,000 TEU's[3] each. Notice of the filing of Agreement 9902–3 with the FMC was published in the *Federal Register*[4] and an opportunity was afforded interested parties to submit comments and requests for hearing. Petitioner USL submitted comments and requested a hearing on the agreement, emphasizing the antitrust issues raised by the amendment and noting certain specific items of the agreement which were unclear. Euro-Pacific replied to these comments, and USL filed a response and again requested a hearing. No affidavits of fact were submitted by either party.

The FMC considered Agreement 9902–3 at its regular meeting on August 26, 1976. At that time the Commission voted to (1) approve the portion of 9902–3 which allowed for replacement of the current fleet, on condition that such replacement fleet be limited to six containerships with an average capacity of 650 TEU's each; and (2) set down for investigation and hearing the questions whether ICT should be allowed to join the Euro-Pacific service, and whether the Euro-Pacific fleet should be allowed to expand to eight 1,000-TEU containerships. The Commission directed that an appropriate order effectuating this action be issued and served upon the parties.[5]

The order, however, was not issued. During the period between August 26 and September 28 a number of communications relating to the merits of Agreement 9902–3 were received by the FMC staff. These included unclassified notices from the governments of France and Germany strongly supporting ICT's participation in the joint service and urging the Commission to approve ICT's admission.[6] In addition, there was further communication from the Euro-Pacific parties asserting their financial need for ICT's membership in their service and urging that this was merely a reentry by ICT into the agreement, not a new service or a new participant.[7] At its meeting of September 29, acting on a memorandum from its managing director, the Commission reconsidered its determination of August 26 regarding Agreement 9902–3. At the September 29 meeting the Commission voted to modify its prior decision so as to allow immediate inclusion of ICT as a third party to Euro-Pacific.[8] An order to this effect was issued, dated September 29, and the new Agreement 9902–3 as modified became effective October 15.[9] It would remain in effect until the March 21, 1977

**2.** Joint Appendix (JA) 53.

**3.** TEU refers to a "twenty foot equivalent unit," a unit of volume used to designate the container capacity of a vessel. Each TEU has a volume of 1,000 feet.

**4.** 41 Fed.Reg. 17420 (1976).

**5.** JA 67.

**6.** JA 72.

**7.** JA 72–73.

**8.** JA 71.

**9.** JA 16–18.

expiration of the underlying agreement. Since Euro-Pacific accepted the lower capacity fleet limitation, the Commission decided no hearings were necessary.

■ Although USL was a party-protestant to these proceedings, it was not served with nor was it informed of the communications to the FMC staff from the French and German governments or of the additional information and argument provided by the Euro-Pacific parties during the interval between the two Commission meetings. In addition, the Commission's order approving the amendment was not served on USL.[10] USL learned of the Commission's action only during the course of inquiry as to the status of its protests.

USL then petitioned this court for review and summary reversal of the Commission's order approving Agreement 9902–3, docketed here as No. 76–2004. The Commission requested remand of its order so that it might more fully articulate its reasons for approval. By order of February 7, 1977 this court granted the Commission's motion for remand, retaining jurisdiction of USL's petition for review, and dismissed USL's motion for summary reversal.

Upon remand, without further submissions by the parties, the Commission issued a supplemental opinion outlining the balancing process it applied in reaching the decision to approve the amendment to the Euro-Pacific agreement allowing inclusion of ICT.[11] It compared the harm to be suffered by USL with the benefits to be gained by Euro-Pacific should no trial-type hearing be held. Relying upon the original submissions of the parties, their identities,

and "the reliable data reposing in the files of the Commission," the FMC concluded that no further hearing was required and that immediate approval of Agreement 9902–3 was appropriate.[12]

By the time the Commission issued its second opinion, the underlying agreement authorizing the Euro-Pacific joint service was due to expire. In a separate opinion the Commission on March 21, 1977 ordered an investigation and hearing on the question whether the agreement should be extended for five additional years and whether the additions to the fleet, proposed by Euro-Pacific, should be permitted.[13] At the same time, the Commission approved an amendment, 9902–5, extending the joint service agreement, as previously amended, pending completion of the investigation and hearing.[14] This extension allowed ICT, which had been admitted to the joint service effective October 15, 1977 by the Commission's earlier order, to remain in that service at least until the final decision of the Commission on the extension of the agreement.

## II. THE STANDARD OF REVIEW

■ The Administrative Procedure Act (APA)[15] embodies a broad determination by Congress to subject the decisions of government agencies to review by the courts. Under the APA the action of "each authority of the Government of the United States," which includes the Federal Maritime Commission, is subject to judicial review except where review is statutorily prohibited or where action is committed to agency discretion by law[16]—exceptions which none of

---

10. This failure to serve a party with the final order, although apparently not prejudicial in this case, is clearly inconsistent with the notion of a fair hearing in which the public has an opportunity to participate in the decisionmaking process, to seek reconsideration by the Commission, and to petition for review by the court. *See* Part II–C–3 *infra*. Indeed, FMC regulations provide that "[a] copy of each decision when issued shall be served on the parties to the proceeding," 46 C.F.R. § 502.225 (1976), and the Commission's failure to do so here appears to be a violation of its own rules.

11. JA 78–92. The Commission's opinion was accompanied by an order denying USL's application for a temporary stay of the Commission's approval of Agreement 9902–3.

12. JA 87.

13. JA 528–529.

14. JA 525–527.

15. 5 U.S.C. §§ 551–559, 701–706 (1976).

16. *Id.* §§ 701–704.

the parties even suggest are applicable to the FMC decisions at issue here.

■ The scope of review is defined by Section 706 of the APA, which authorizes the courts to review the record and to set aside any agency decision found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1976), or any action violating applicable statutory or constitutional requirements.[17] In addition, in a limited category of cases [18] courts are required to set aside agency action which is not supported by "substantial evidence." 5 U.S.C. § 706(2)(E) (1976). This substantial evidence test applies in cases where a hearing "on the record" is required by statute, see 5 U.S.C. §§ 553(c), 554(c)(2) (1976), a requirement which is neither found in the applicable language of the Shipping Act nor reasonably inferred from its legislative history.[19] But the fact that the decisions here are not subject to the substantial evidence test does not render the evidence immune from judicial examination, nor does it turn judicial review under the applicable standards into a rubber stamp for the FMC's decisions.

■ The governing standards for judicial review of agency action under the arbitrary and capricious test of Section 706, which is applicable here, were defined by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and have been reviewed by this court at some length on a number of recent occasions. *See, e. g., Home Box Office, Inc. v. FCC*, 185 U.S.App.D.C. 142, 167–169, 567 F.2d 9, 34–36 *(per curiam), cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 405–409, 541 F.2d 1, 33–37 *(en banc), cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49

L.Ed.2d 394 (1976). The critical elements of such review are clear. While the decision of the agency is "entitled to a presumption of regularity," the presumption "is not to shield * * * action from a thorough, probing, in-depth review." *Overton Park, supra*, 401 U.S. at 415, 91 S.Ct. at 823. Initially, the court must determine whether the agency acted within its statutory authority; if it did, the court must then examine the actual choice made to determine whether it is arbitrary or capricious. *Id.* at 415–416, 91 S.Ct. 814. The ultimate standard of review governing this latter inquiry is a narrow one: the court is not permitted to substitute its judgment for that of the agency. *Id.* at 416, 91 S.Ct. 814. Nonetheless, the court's inquiry must be "searching and careful," *id.*, and the court must ensure "both that the Commission has adequately considered all relevant factors * * * and that it has demonstrated a 'rational connection between the facts found and the choice made,'" *Home Box Office, Inc. v. FCC, supra*, 185 U.S.App.D.C. at 168, 567 F.2d at 35, *quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Finally, the court must examine the procedures employed by the agency in reaching its decision to ensure that these procedures comply with applicable statutory and constitutional requirements. *Overton Park, supra*, 401 U.S. at 417, 91 S.Ct. 814.

■ Our task in this case, then, is to conduct the "searching and careful" inquiry mandated by the Supreme Court in *Overton Park* to determine whether the agency action challenged here complies with the standards set forth in the Administrative Procedure Act, as well as with the provisions of the Shipping Act and the agency's own regulations.[20] With these principles in

---

**17.** *Id.* § 706(2)(A)–(D).

**18.** The substantial evidence test is applicable in cases "subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E) (1976).

**19.** *See* Part II–C–1 *infra.*

**20.** Although it is within the power of the agency to amend or repeal its own regulations, the agency is not free to ignore or violate its regulations while they remain in effect. *United States v. Nixon*, 418 U.S. 683, 693–696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v.*

mind, we turn to the specific claims raised by petitioners.

### A. Antitrust Considerations

■ Section 15 of the Shipping Act requires all agreements between common carriers by water which deal with such factors as rates, allotments of ports and restrictions of traffic, distribution of earnings, and the like to be submitted to the Federal Maritime Commission for approval.[21] The Commission is required to disapprove, cancel, or modify any agreement or modification which it finds to be "unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest." 46 U.S.C. § 814 (1970). Agreements approved by the FMC are exempt from the antitrust laws.[22]

Petitioner asserts that in reaching its decision to approve the agreements challenged here the Commission has not "adequately considered all relevant factors" specified in the statute, Overton Park, supra, 401 U.S. at 416, 91 S.Ct. 814. The argument, made most strongly here by the Department of Justice,[23] is that the Commission is required by statute to consider the public interest, which embodies the national antitrust policies and the accompanying national policy favoring competition, in determining whether approval is justified. In this case, it is asserted, the Commission approved the Euro-Pacific agreements and shielded them with immunity from the antitrust laws without considering whether their anticompetitive aspects were justified.

### 1. The Obligation of the FMC under Section 15 to Consider Antitrust Implications

Section 15 of the Shipping Act of 1916 represents a compromise between the established national antitrust policy and the potential public benefits to be derived from allowing ocean carriers to restrict or eliminate competition among themselves. An extensive congressional study of the practices of carrier conferences and their advantages and disadvantages was made in 1914, culminating in what has come to be known as the Alexander Report. H.R.Doc. No. 805, 63d Cong., 2d Sess. (1914). While the report found that there were substantial advantages to conference arrangements, it also identified various abuses in which conferences had engaged. Consequently, it was the recommendation of the report, adopted by Congress, that shipping conferences be allowed to continue only under government regulation.[24] Congress created the United States Shipping Board, predecessor to the FMC, and under Section 15 of the Shipping Act charged it with responsibility for approving all such conference agreements.[25] It was directed to disapprove those agreements which were unjustly discriminatory or unfair, detrimental to United States commerce, or in violation of the Shipping Act, and to approve all others. Only with approval from the Commission

---

Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

**21.** 46 U.S.C. § 814 (1970); see note 1 supra. The only exception to this requirement is for types or classes of agreements which the Commission, after appropriate administrative proceedings, determines are of such a de minimis or routine character as not to require that they be formally filed. See Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 276, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). That the agreements at issue here do not fall within this de minimis exception is clear and is not disputed by the parties.

**22.** 46 U.S.C. § 814 (1970); see note 1 supra. Even apart from possible antitrust violations, any agreement not approved by the FMC is declared unlawful in § 15.

**23.** The Department of Justice, representing the United States as a statutory respondent in this proceeding pursuant to 28 U.S.C. § 2344 (1970), argued against affirmance of the FMC orders at issue here.

**24.** H.R.Doc. No. 805, 63d Cong., 2d Sess. 415–419 (1914).

**25.** 39 Stat. 728.

would these anticompetitive agreements receive immunity from the antitrust laws.

In 1959 Congress undertook an extensive review of the Shipping Act.[26] As a result Section 15 was amended in 1961 to require the Commission, in addition to its consideration of the factors already enumerated in Section 15, to disapprove as well any agreement "contrary to the public interest." [27]

■ It has been repeatedly held, by the Supreme Court as well as this court, that the Commission's mandate to guard "the public interest" requires it to consider the antitrust implications of the agreements submitted to it for approval. In *FMC v. Svenska Amerika Lines,* 390 U.S. 238, 244–245, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968), the Supreme Court rejected the argument that because the Shipping Act is designed to grant antitrust immunity to approved contracts, consideration of the antitrust implications of an agreement cannot serve as grounds for disapproval. The Court noted that "[b]y its very nature an illegal restraint of trade is in some ways 'contrary to the public interest,'" *id.* at 244, 88 S.Ct. at 1009, and it approved the strict antitrust standard applied by the Commission in that case [28] as "giv[ing] understandable content to the broad statutory concept of 'the public interest.'" *Id.* at 244, 88 S.Ct. at 1009. In *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 274 & n.21, 88 S.Ct. 929, 936, 19 L.Ed.2d 1090 (1968), the Supreme Court reiterated its holding that the Commission is required under Section 15 to consider antitrust implications, quoting with approval this court's statement in an earlier case [29] that "[t]he condition upon which

such authority [to grant exemptions from the antitrust laws] is granted is that the agency entrusted with the duty to protect the public interest scrutinize the agreement to make sure that the conduct thus legalized does not invade the prohibitions of the anti-trust laws any more than is necessary to serve the purposes of the regulatory statute." And finally, just this Term, the Supreme Court again reaffirmed the obligation of the FMC to examine the antitrust implications of all Section 15 agreements. *FMC v. Pacific Maritime Ass'n,* 435 U.S. 40, 53–54, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978).

■ Under the Shipping Act, then, the FMC has the responsibility to consider carefully the antitrust aspects of all agreements submitted for its approval. While our task as a reviewing court is emphatically not to substitute our judgment as to the public interest for that reached by the Commission, we are charged under the Administrative Procedure Act with ensuring that the Commission has complied with its statutory mandate and considered the relevent factors set forth in the statute in reaching its decision. *See Overton Park, supra,* 401 U.S. at 415–416, 91 S.Ct. 814; *Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at 405–409, 541 F.2d at 33–37. In the case of Agreement 9902–3, the Commission has clearly failed to do so, for it neglected to consider adequately an extremely relevant factor: the antitrust implications of the agreement it approved.

### 2. The Commission's Decision

The Commission's first order approving Agreement 9902–3 as modified simply recit-

---

**26.** *See FMC v. Svenska Amerika Lines,* 390 U.S. 238, 243 n.2, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968) (detailing hearings held).

**27.** 75 Stat. 762.

**28.** The antitrust standard imposed by the Commission in *Svenska* required the carriers to justify an anticompetitive agreement which was a *per se* violation of the antitrust laws by demonstrating that it was "required by a serious transportation need, necessary to secure important public benefits, or in furtherance of a valid regulatory purpose of the Shipping Act." 390 U.S. at 243, 88 S.Ct. at 1009.

**29.** *Isbrandtsen Co. v. United States,* 93 U.S. App.D.C. 293, 299, 211 F.2d 51, 57, *cert. denied,* 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954). The *Isbrandtsen* decision imposed upon the Commission the duty to protect the public interest and to consider the antitrust implications of agreements even before § 15 was amended in 1961 to add the public interest as a factor which the Commission was explicitly required by statute to consider. *See also Marine Space Enclosures, Inc. v. FMC,* 137 U.S.App.D.C. 9, 17, 420 F.2d 577, 585 (1969) (post-amendment decision holding that FMC must consider antitrust implications of § 15 agreements).

ed the Commission's finding "that the protest of USL is without merit," JA 17; no mention at all was made of the anticompetitive aspects of the agreement or, for that matter, of the "public interest" in any form. Upon remand from this court, the Commission issued a second opinion clarifying the reasons for its initial approval of 9902–3 and denying USL's petition for a stay of its order.[30]

This second opinion was devoted virtually exclusively to the question whether USL was entitled to an evidentiary hearing prior to Commission action on the agreement. The Commission recognized that "[i]n aid of the public interest, [it] must tread the narrow path between on the one hand, permitting undue concentrations of economic power as a result of anticompetitive agreements entered into among common carriers, and, on the other hand, permitting the processes of the Commission to be used as a competitive tool by individual carriers." JA 86. In this case, the Commission stated, it was "faced with balancing the interest of Protestant in obtaining a trial type evidentiary hearing, which, in the experience of the Commission are usually lengthy, against the interest of the Proponents in modernizing their fleet." *Id.* While delay in allowing the carriers seeking Commission approval to compete is acceptable in certain circumstances, the Commission reasoned, "it is not acceptable where the amendment is not prima facie contrary to the public interest,[31] where the agreement being amended will terminate in a

short period of time, and where the protestant * * * only asserts that the proponents are required to prove the worth of the agreement." JA 87. On the basis of its consideration of the identities and submissions of the parties and "the reliable data reposing in the files of the Commission," the FMC concluded "that the consideration of Protestant's arguments was the hearing appropriate to this case, and that Agreement No. 9902–3 should be approved immediately, without further preapproval hearing." *Id.* The only substantive issue addressed by the Commission was the overtonnage problem raised by USL; "the Commission examined that problem carefully, in the light of the data then available to the Commission," and concluded that if the amendment were modified no overtonnage problem would be posed. JA 88.

### 3. *Analysis*

We appreciate the Commission's concern that Section 15 proceedings might result in delay—to the benefit of protesting carriers—of competition which would serve the public as a whole. Clearly, the public interest is no more served by competitors who seek, through lengthy evidentiary hearings, to delay implementation of agreements which would adversely affect them competitively than it is by those who seek to enter into agreements which would unjustifiably restrict competition. We appreciate, too, the Commission's recognition that an evidentiary hearing may be less appropriate where, as here, only short-term authority is

---

**30.** JA 78–91.

**31.** Although the Commission does not specifically define anywhere in its opinion what constitutes a *"prima facie"* showing that an agreement is "contrary to the public interest," its discussion of prior Commission precedents suggests that whether or not a practice is a *per se* violation of the antitrust laws is at least one factor being considered by the Commission in defining the applicable test. *See* JA 82–83. Certainly, practices which are *per se* violations of the antitrust laws must raise serious public interest questions, *see FMC v. Svenska Amerika Lines, supra* note 26, 390 U.S. at 244, 88 S.Ct. 1005, and must be scrutinized carefully by the Commission. But the fact that a given

practice is considered under a rule of reason, rather than as a *per se* violation, does not mean that the dangers to competition in any particular circumstance are necessarily lower; clearly, certain practices which are not *per se* violations may, depending upon the facts of the particular case, restrict competition more severely than would *per se* restraints. As a result, any determinative line drawn at *per se* violations cannot adequately serve to fulfill the Commission's responsibility to protect the public interest, and to ensure that the agreements entered into by carriers do not restrict competition any more than is necessary to serve the public consistent with the purposes of the Shipping Act.

involved. But the Commission's nearly exclusive focus on whether an evidentiary hearing was appropriate obscures its basic statutory responsibility in this case: to decide whether approval of the agreement at issue was justified in light of the factors set forth in Section 15.

As noted earlier, the Commission is required under Section 15 to disapprove agreements which it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, or importers, to operate to the detriment of commerce, or to be contrary to the public interest.[32] In some sense, the Commission's analysis of the agreement's fairness as to USL might be said to be subsumed in its balance of "the interest of Protestant in obtaining a trial type evidentiary hearing * * * against the interest of Proponents in modernizing their fleet." JA 86. Even as to this point, however, the Commission's analysis was facially incomplete: the balance it struck took account only of Euro-Pacific's interest in modernizing its fleet and made no mention of the second element of the amendment, the addition of a third party to the conference. More importantly, the Commission's analysis not only limited itself to USL as a competing carrier—making no mention of any effects on other carriers, importers, or exporters—but also failed completely to address the additional factors of the public interest and the antitrust implications of the agreement which had been raised by USL.

Whether the arrangement established by Agreement No. 9902–3 is viewed as a division of markets, and illegal *per se* under the antitrust laws,[33] or as a joint venture to be considered under a rule of reason,[34] it is clear that serious antitrust issues are posed by its implementation. Elimination of ICT as a potential competitor in the market raises definite questions as to the extent to which competition is being restrained.[35] To be sure, any anticompetitive consequences of this arrangement were limited in duration; Agreement No. 9902–3 permitted ICT to enter the joint service only for the duration of the basic agreement, a period later expanded by the *pendente lite* order until completion of the hearings. The limited duration of an arrangement is certainly a factor which may be taken into account by the Commission in evaluating the likely antitrust consequences of an agreement and determining whether the public interest supports approval notwithstanding these consequences. But this factor does not excuse the Commission from any consideration at all of antitrust consequences. Section 15 of the Shipping Act applies to "any agreement" entered into by carriers, including agreements limited in their duration. There must be adequate consideration and justification for Commission approval of an agreement restricting competition even for the brief period of five months, let alone the longer period until final hearings are completed.

32. See text at notes 21–22 *supra*.

33. See, e. g., Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

34. See United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); Appalachian Coals, Inc. v. United States, 288 U.S. 344, 376–377, 53 S.Ct. 471, 77 L.Ed. 825 (1933).

35. As the Justice Department has pointed out: "The competitive impact of such an action obviously cannot be estimated without some data on the existing concentration of the market and Euro-Pacific's existing market share, and, if an anticompetitive effect appears likely, it certainly calls for more justification that the unsworn, conclusory statement of counsel that Intercon-

tinental would not have entered on its own." Brief for the United States at 7.

Not only is counsel's statement that ICT would not have entered independently unsupported by any facts included in the record, but it is also unresponsive to the antitrust question of what influence ICT exercises over the market as a *potential* competitor, even if it would not ultimately choose to enter. Finally, USL's allegations as to the corporate entity known as the Bostrom group—a major operator in both the Atlantic and South Atlantic/Gulf trades—which now controls ICT, and its desire to expand its influence into the Pacific Coast-Europe trade route at least raise questions as to an undue concentration of influence which are nowhere addressed by the Commission.

In this case the only mention of the anticompetitive effects of 9902–3 comes in the context of the Commission's distinction of earlier cases in which evidentiary hearings have been required. Those cases, the Commission emphasized, involved arrangements which were *per se* violations of the antitrust laws; in this case, on the other hand, "the amendment would not, necessarily, eliminate or restrain any actual competition." JA 83. Perhaps not. But the fact remains that the agreement in this case on its face raised serious antitrust questions and presented the potential, nowhere denied by the Commission, that competition would be unduly restrained. If the Commission chooses not to determine whether competition will in fact be restrained substantially, then it must at least demonstrate that it has considered the antitrust implications and has found that the public interest supports approval notwithstanding the possible anticompetitive effects. The responsibility delegated to the Commission by Congress is not simply to guard against *per se* violations of the antitrust laws; it is to protect the public interest, which may be adversely affected by all forms of anticompetitive arrangements. In this case the FMC simply failed to address itself in any way to one of the factors specified by Congress in the Shipping Act; it failed, in the words of *Overton Park*, to consider adequately "the relevant factors."

Nor was this defect in Agreement 9902–3's approval cured by the Commission's decision extending the joint service authority *pendente lite*. As might be expected, that decision simply examined whether the agreement as a whole, as it existed at that time, should be extended pending a full investigation [36]; it did not address the somewhat separate question whether ICT's past and continued participation, as distinct from that of the two other conference members, was justified. This course might be acceptable had the Commission in its order approving 9902–3 considered the antitrust implications of ICT's participation before it concluded that approval was justified. But in this case it means that no consideration or explanation has yet been provided by the Commission as to the antitrust questions raised by ICT's entry into the joint service.

In seeking to justify its failure to address the antitrust implications in this case the Commission emphasizes two points. First, it asserts that the protestant, USL, merely alleged the existence of possible antitrust violations, rather than substantiating its claim with further argument and documentation.[37] The short answer to this argument is that the FMC has an independent statutory responsibility in the public interest to consider the factors set forth in Section 15 of the Act, including the antitrust implications of agreements, before granting its approval. In this case, where the amendment requested approval for addition of a third party, the fact that antitrust questions were raised was clear on the face of the amendment. And if it was not, USL's allegations were certainly sufficient to put the Commission on notice of the antitrust questions raised. *See Marine Space Enclosures, Inc. v. FMC,* 137 U.S. App.D.C. 9, 18, 420 F.2d 577, 586 (1969). More basically, while we have no dispute with the Commission's apparent desire for fuller argumentation and participation by protesting parties, its absence here seems most directly related to the Commission's own practices and decisional process. USL submitted its protest in the hope of securing a full hearing on the antitrust issues it raised. At no time did the Commission either request further substantiation from USL or suggest that it would or might reach its final decision on the basis of the parties' submissions, and that if USL wished to substantiate its claim further it should do so at that point. For the Commission then to grant approval without any hearing on the ground that USL had failed to substantiate its claims appears wholly inconsistent with its own refusal to notify USL of the pendency of its decision or the

---

36. *See* JA 525–526.

37. *See* JA 87; brief for the FMC at 14–20.

need for further substantiation. Indeed, the real point seems to be that if the parties are to participate meaningfully in Commission decisionmaking, as the FMC itself has asserted that it wishes, then they must be on notice as to the point in the process where a decision may be forthcoming so that they can submit all their arguments and documentations to the Commission for its consideration prior to its decision. *See Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC* (No. 75–1855, decided May 4, 1978) (*en banc*). And certainly the failure of USL to substantiate more fully its antitrust claims in this case cannot serve to justify the Commission's total failure to address itself to the antitrust implications of the agreement it approved.

■ The Commission's second justification for the failure of its decision to address the antitrust implications fares no better. In its brief to this court the Commission suggested that it had, indeed, considered the antitrust implications and, in addition, that its final decision was consistent with an analysis of the competitive ramifications of the contract.[38] It may well be that some or all of the members of the Commission in fact took account of the antitrust implications of this agreement in concluding that it should be approved. And it might also be that full consideration of the antitrust aspects of this agreement would in fact prove completely consistent with the Commission's final decision to approve the amendment. But we as a reviewing court are required to base our decision on the record in the case, *see* 5 U.S.C. § 706 (1970), not on the unstated considerations of Commission members or on reasoning or argument advanced for the first time on review. The Supreme Court has made clear that where,

as here, there was a contemporaneous explanation given for agency action, the validity of that action must "stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If that finding is not sustainable on the administrative record made, then the \* \* \* matter [must be] remanded \* \* \* for further consideration." *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). *See Burlington Truck Lines, Inc. v. United States, supra,* 371 U.S. at 168–169, 83 S.Ct. 239; *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

### 4. *Summary*

■ In this case the failure of the Commission to address in its decision the antitrust implications of Agreement 9902–3 requires us to remand the record here to the Commission for further consideration.[39] Only when the Commission has more fully explicated its reasons for action can we as a reviewing court, consistent with our obligations under the Administrative Procedure Act, 5 U.S.C. § 706 (1976), properly determine the validity of that action. *See Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Citizens Ass'n of Georgetown, Inc. v. Zoning Com'n of D.C.,* 155 U.S.App.D.C. 233, 235, 477 F.2d 402, 408 (1973); *Greater Boston Television Corp. v. FCC,* 143 U.S.App. D.C. 383, 392, 444 F.2d 841, 850 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *WAIT Radio v. FCC,* 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969). And because we are unable at this point to say that the Commission was justified in allowing ICT to participate in the joint service in the first instance, its

---

**38.** The Commission's brief repeatedly emphasizes what the FMC "could reasonably find" as to the antitrust issues raised by this agreement. *See* brief for the FMC at 14–20. As to inclusion of ICT in the joint service, for example, the FMC argues that "the Commission could reasonably find as a matter of law that that period of time (during which ICT/HAL had been out of the joint service) was not significant in view

of its previous long history of participation in the trade only as a participant in a joint service." *Id.* at 20. But whether or not this is correct as a matter of law, the fact is that this "finding" nowhere appears in the Commission's decision.

**39.** *See Kennecott Copper Corp. v. EPA,* 149 U.S.App.D.C. 231, 462 F.2d 846 (1972).

approval of 9902–5 extending the joint service authority, as previously amended to include ICT, must be subject to remand of the record as well.

### B. Blind References

The failure adequately to consider antitrust implications is not the only defect in the Commission's decision approving Agreement 9902–3. Twice in the course of its decision the Commission stated that it had made critical findings on the basis of data which was not included in the record of this case and, indeed, which is nowhere specifically identified by the Commission. "In making its judgment on Agreement 9902–3," the Commission stated, it "considered the submissions of Protestant and Proponents, the identities of Protestant and Proponents, and *the reliable data reposing in the files of the Commission.*" JA 87 (emphasis added). And in resolving USL's claim that approval would overtonnage the trade—the only substantive issue addressed by the Commission in its decision—"the Commission examined that problem carefully, *in the light of the data then available to the Commission,*" and concluded that the agreement as modified should be approved. JA 88 (emphasis added).

■ We do not know what "reliable data" was "reposing in the files of the Commission" or was "then available" to it. No explanation is given in the rest of the Commission's opinion, or in its briefs to this court, as to what specific information the Commission was relying upon.[40] But it is clear that the decisions made in reliance on these data were critical ones: the Commission's resolution of the overtonnage issue,

which it recognized to be a serious concern, and, indeed, its overall balance to determine whether approval should be granted, were reached, according to the Commission itself, at least in part on the basis of information unknown to the parties and to this court.

The Commission's reliance on these "data" to support its decision precludes effective judicial review in this case. While our task is not to review the evidence for the purpose of determining whether the Commission's decision is supported by "substantial evidence," application of the arbitrary and capricious standard of review does require us to make a "searching and careful" inquiry of the record in this case to ensure "both that the Commission had adequately considered all relevant factors * * and that it has demonstrated a 'rational connection between the facts found and the choice made.'" *See* 189 U.S.App.D.C. at ——, 584 F.2d at 526, *supra.* This we cannot do where, as here, the data relied on by the Commission in reaching its decision is not included in the administrative record[41] and is not disclosed to the court. The reason is obvious, and has long been recognized: we simply cannot determine whether the final agency decision reflects the rational outcome of the agency's consideration of all relevant factors when we have no idea what factors or data were in fact considered by the agency. *See Camp v. Pitts, supra; Overton Park, supra; Ohio Bell Telephone Co. v. Public Utilities Com'n,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); *Citizens Ass'n of Georgetown, Inc. v. Zoning Com'n of D.C., supra.* We cannot, in other words, determine whether the agency action is arbitrary and capricious.[42]

---

**40.** With respect to the overtonnage issue, the Commission does cite, in the succeeding paragraphs of its opinion, certain specific vessel capacities and sailing frequencies. JA 88–89. But we have no idea whether these figures, in whole or in part, constitute "the data then available to the Commission." JA 88. Certainly, judicial review cannot be based on such speculation as to the meaning which should be attached to what the Commission states. *See Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve*

*Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–417, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

**41.** *See* 5 U.S.C. § 706 (1970) (requiring judicial review of whether agency action is arbitrary or capricious to take place on the basis of "the whole record or those parts of it cited by a party").

**42.** As Mr. Justice Cardozo stated in *Ohio Bell Telephone Co. v. Public Utilities Com'n,* 301 U.S. 292, 302–303, 57 S.Ct. 724, 730, 81 L.Ed. 1093 (1937):

Even where the reviewing court is informed of the specific information upon which reliance was placed, a barrier to effective judicial review remains: the absence of any adversarial comment among the parties.[43] Our cases make clear the importance of such comment in allowing a court to review the action taken by the agency, as well as in facilitating informed agency decisionmaking itself. Thus we have required information in agency files or reports identified by the agency as relevant to the proceeding to be disclosed to the parties for adversarial comment. See Portland Cement Ass'n v. Ruckelshaus, 158 U.S. App.D.C 308, 326–327, 486 F.2d 375, 393– 394 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Similarly, we have insisted that agencies set forth their thinking, and disclose their expert knowledge, in notices of proposed rulemaking. See Environmental Defense Fund, Inc. v. EPA, 179 U.S.App.D.C. 43, 52, 548 F.2d 998, 1007 (1976); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 439, 478 F.2d 615, 643 (1973). Such requirements not only ensure that parties to agency proceedings are afforded the opportunities guaranteed them by statute meaningfully to participate in those proceedings; they also provide a means by which a reviewing court, called upon to determine whether agency action is arbitrary and capricious, can secure needed guidance in the performance of this function from both the parties and the agency. See Portland Cement Ass'n v. Ruckelshaus, supra, 158 U.S.App.D.C. at 326–327, 486 F.2d at 393–394; International Harvester Co. v. Ruckelshaus, supra, 155 U.S.App.D.C. at 445, 478 F.2d at 649; Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App. D.C. 200, 208, 407 F.2d 330, 338 (1968). Cf. National Nutritional Foods Ass'n v. Weinberger, 512 F.2d 688, 701 (2d Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). Indeed, if the substance or identity of the data upon which the agency has relied is permitted to remain hidden until judicial review, the courts may well find themselves called upon to resolve novel disputes as to the truth of what the agency thought it knew, disputes which should have been resolved either in the initial hearings before the agency or on reconsideration. From this perspective, our insistence that this information be revealed during the agency proceedings not only serves the interests of the parties and the court, but also preserves the prerogatives of the agency to address in the first instance the questions of law and fact raised by its action.

This is not to say that an agency may never rely on data in its files, or on public information, in reaching its decision.[44] Rather, we hold only that the agen-

---

**43.** The failure to include the information relied upon by the agency in the administrative record, even if later disclosed to the court, is also inconsistent with the Administrative Procedure Act's requirement that review take place on "the whole record." 5 U.S.C. § 706 (1976).

"* * * From the standpoint of due process—the protection of the individual against arbitrary action—a deeper vice is this, that even now we do not know the particular or evidential facts of which the Commission took judicial notice and on which it rested its conclusion. * * *

* * * In such circumstances judicial review would be no longer a reality if the practice followed in this case were to receive the stamp of regularity. To put the problem more concretely: how was it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved was unknown and unknowable? * * *

"[I]t is the obligation of this court to test the actions of the Commission for arbitrariness or inconsistency with delegated authority" against " 'the full administrative record that was before [an agency official] at the time he made his decision.' " Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. 142, 187, 567 F.2d 9, 54 (per curiam), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed. 89 (1977), quoting Citizens to Preserve Overton Park, Inc. v. Volpe, supra note 40, 401 U.S. at 420, 91 S.Ct. 814. See also Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S. App..D.C. 200, 208, 407 F.2d 330, 338 (1968) (the record must "enable us to see what major issues of policy were ventilated by the informal proceeding and why the agency reacted to them as it did").

**44.** See Moss v. FPC, 164 U.S.App.D.C. 1, 5, 502 F.2d 461, 465 (1974); Consumers Union of U. S., Inc. v. Consumer Product Safety Comm'n, 491 F.2d 810, 812 (2d Cir. 1974). These cases, which deal with informal rulemaking, provide

cy must either disclose the contents of what it relied upon or, in the case of publicly available information, specify what is involved in sufficient detail to allow for meaningful adversarial comment and judicial review. While such disclosure would ideally appear appropriate at the earliest stage of the agency proceeding, at the very least it is clear that it must come in the final decision so that reconsideration may be sought and judicial review meaningfully afforded. Consistent with the requirements of judicial review according to the Administrative Procedure Act, an agency decision based on "reliable data reposing in the Commission's files" simply cannot withstand scrutiny.

In reaching this decision, we are not unmindful of the legitimate claims that agency expertise in this area is deserving of the deference of the court. *See* L. Jaffe, Judicial Control of Administrative Action 576–585 (1965). But agency expertise does not afford the agency absolute power; the existence of judicial review, albeit under a presumption favoring the agency's decisionmaking, *see Overton Park, supra,* 401 U.S. at 415, 91 S.Ct. 814, negates any notion that the deference to be accorded the agency's expertise in any particular field is absolute

or its discretion unreviewable.[45] While we are "entitled to rely upon the expertise" of the agency, and indeed are "required to give proper weight to such expertise," this court "is not entitled to rely blindly on such purported expertise. * * * The Commission's decision and the rationale supporting it may be entirely valid, but the Commission cannot take refuge in its alleged expertise in this field, when it does not set forth convincing reasons for its determination in sufficient detail to allow the validity of those reasons to be critically examined by the parties adversely affected and to allow this Court to pass on the reasonableness of the Commission's conclusions." *Public Service Com'n of State of N. Y. v. FPC,* 141 U.S.App.D.C. 174, 176–177, 436 F.2d 904, 906–907 (1970).[46]

While foreclosure of effective judicial review is itself sufficient reason for this court to require the FMC to disclose the information upon which it relies, we think such disclosure is also necessary to ensure the parties to Section 15 proceedings the opportunity to participate in the Commission's decisionmaking which is guaranteed them by statute. As discussed more fully below,[47] Section 15 of the Shipping Act requires a "hearing" to be held prior to

---

that agencies may rely upon data in their files in reaching their decisions. But they do not hold that an agency may do so without informing the parties of what data it has utilized. While reliance on experience and expertise may be proper, documented reliance is required.

Nor is *City of Chicago v. FPC,* 147 U.S.App. D.C. 312, 458 F.2d 731 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972), inconsistent with our result here. In *City of Chicago* it was argued that the Federal Power Commission impermissibly relied on extra-record information in reaching a decision as to gas valuation for ratemaking purposes. In rejecting that argument the court pointed out that the statistical data in the Commission's report which was alleged to be extra-record material was accompanied by a footnote identifying its source. As to the remainder of the asserted improper references, the court found that what was involved were interpretations and conclusions which the Commission, making use of its experience in regulating this industry, could permissibly draw from the factual material which *did* appear in the record. *Id.* at 756–757.

45. *See Citizens Ass'n of Georgetown, Inc. v. Zoning Com'n of D. C.,* 155 U.S.App.D.C. 233, 239, 477 F.2d 402, 408 (1973) ("respect for an agency's expertise does not eliminate the need for judicial review of agency actions, and inherent in that albeit limited power of review is the need for an agency to spell out its reasoning").

46. *See Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 627–628, 64 S.Ct. 281, 299–300, 88 L.Ed. 333 (1944) (Frankfurter, J., dissenting):

It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment. * * *
* * * In order to enable this Court to discharge its duty of reviewing the Commission's order, the Commission should set forth with explicitness the criteria by which it is guided * * *.

47. *See* Part II–C–3 *infra.*

Commission approval or disapproval, and while a full evidentiary hearing may not be required in every case, "for a 'hearing' to pass muster in this court, it must be impeccably dressed with fairness." *Sea-Land Service, Inc. v. Connor,* 135 U.S.App.D.C. 306, 310, 418 F.2d 1142, 1146 (1969). Such fairness, we think, requires that the parties be afforded the opportunity to be heard as to their views on the facts and expert opinions of which the Commission takes notice and upon which it relies in reaching its decision.[48] Indeed, the Commission's own rules require this, *see* 46 C.F.R. § 502.226(d) (1976), and its reliance in this case on data within its own files, without disclosing what these data include or affording an opportunity to the parties to rebut their accuracy or validity, violates its own regulations.[49]

### C. *The Hearing Requirement and* Ex Parte *Contacts*

Under the Administrative Procedure Act a reviewing court, in addition to examining whether the final agency decision reflects consideration of all relevant factors, must also determine whether the agency complied with applicable procedural requirements in reaching its conclusion. 5 U.S.C. § 706 (1976); *see Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. 814. In this case it is argued that the FMC failed to conduct the "hearing" required by statute prior to its approval of Agreement 9902–3 and its *pendente lite* authorization of Agreement 9902–5.

---

**48.** *Cf. Home Box Office, Inc. v. FCC, supra* note 43, 185 U.S.App.D.C. at 168, 567 F.2d at 35 ("[T]here must be an *exchange* of views, information, and criticism between interested persons and the agency. * * * Consequently, the notice required by the APA, or information subsequently supplied to the public, must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based.") (emphasis in original; citations omitted); Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review,* 59 Cornell L.Rev. 375, 380–383 (1974).

**49.** 46 C.F.R. § 502.226(a) (1976) provides:

### 1. *The Application of Sections 556 and 557 of the Administrative Procedure Act*

The Shipping Act does not itself specify the type of hearing required prior to approval under Section 15; it states only that the Commission decision is to be made "after notice and hearing." 46 U.S.C. § 814 (1970). Petitioner has argued that the hearing provided by the FMC must comply with the procedural requirements of Sections 556 and 557 of the Administrative Procedure Act governing formal agency hearings. These provisions apply, by the terms of the APA, when a "hearing on the record" is required by statute. 5 U.S.C. §§ 553(c), 554(c)(2) (1976). While the exact phrase "on the record" is not an absolute prerequisite to application of the formal hearing requirements, the Supreme Court has made clear that these provisions do not apply unless Congress has clearly indicated that the "hearing" required by statute must be a trial-type hearing on the record. *See United States v. Florida East Coast R. Co.,* 410 U.S. 224, 234–238, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *United States v. Allegheny-Ludlum Steel Co.,* 406 U.S. 742, 756–758, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

In this case the Shipping Act itself does not provide for a hearing "on the record," and nothing in the terms of the statute or its legislative history indicates that a trial-type hearing, complete with all of the procedures specified in Sections 556 and 557, was intended in all Section 15 cases.[50] Indeed, we have held before that there is room for agency flexibility in structuring

Official notice may be taken of such matters as might be judicially noticed by the courts, or of technical or scientific facts within the general knowledge of the Commission as an expert body: *Provided,* That where a decision or part thereof rests on the official notice of a material fact not appearing in the evidence in the record, the fact of official notice shall be so stated in the decision, and any party, upon timely request, shall be afforded an opportunity to show the contrary.

**50.** *See* 46 U.S.C. §§ 801–842 (1970 & Supp. V 1975); H.R.Rep.No.1247, 87th Cong., 1st Sess. (1961); H.R.Rep.No.498, 87th Cong., 1st Sess. (1961); S.Rep.No.860, 87th Cong., 1st Sess. (1961).

Section 15 hearings in light of the circumstances of the case and the nature of the issues involved. "The requirement of a hearing in a proceeding before an administrative agency may be satisfied by something less time-consuming than courtroom drama." *Marine Space Enclosures, Inc. v. FMC, supra,* 137 U.S.App.D.C. at 21, 420 F.2d at 589. Such flexibility is particularly important where, as is the case with Agreement 9902–5, the Commission sets certain issues for further investigation and trial-type hearing while granting approval of the agreement *pendente lite.* Clearly, if such approval could not be granted by the Commission on the basis of something less than a full trial-type hearing, the *pendente lite* authority would effectively be paralyzed.

We conclude, therefore, that Section 15 hearings are not required by statute to be conducted in accordance with Sections 556 and 557 of the APA. The Commission thus enjoys substantial flexibility to structure the hearings it must provide depending on the nature of the case and the issues requiring resolution. But that freedom is not absolute. The Shipping Act does require that there be a "hearing," and that statutory requirement, like the requirement of comment in notice and comment rulemaking,[51] imposes certain minimum constraints on the procedure followed by the agency. One of these constraints, we think, was clearly violated by the FMC's recourse to secret *ex parte* contacts prior to its approval of Agreement 9902–3.

### 2. *The* Ex Parte *Contacts in this Case*

As noted earlier,[52] as of August 26, 1976 the Commission had received comments from USL and the Euro-Pacific parties as to the proposed agreements. There was nothing secret about these comments: they were provided in each instance to the opposing parties, and were available to other members of the public. At its regular meeting on August 26th the Commission decided that ICT *should not* be permitted to enter the conference at that time, but that instead the issue should be set down for further investigation and hearing. The Commission then directed that an order to this effect be issued.[53] The order was not issued, however, for reasons which are unexplained. And at its September 29th meeting the Commission squarely reversed its position on admission of ICT, which is the critical antitrust question raised by 9902–3. On that day, without notice to USL or to the public, the Commission reconsidered its earlier decision and determined that ICT could immediately become a party to the Euro-Pacific agreement without any further hearing or investigation. An order to that effect was signed on the same day.[54]

The *ex parte* communications at issue here took place between August 26th and September 28th; indeed, they appear to be the only comments received by the Commission and its staff during this critical period. We do not know exactly how many contacts there were, or exactly what was said, or what the Commission staff conveyed to the Commission as to the substance of the communications in which it engaged. Our only indication as to the nature of these contacts is found in an excerpt from a September 28th staff memorandum to the Commission, included in the joint appendix in this action, which served at least in part as the basis of the Commission's September 29th decision to permit ICT to join the conference. The memorandum was to provide "additional information to the Commission in the event it wishes to reconsider its decision not to approve the addition of ICT to Euro-Pacific." JA 72. The joint appendix in this case at

---

**51.** *See Home Box Office, Inc. v. FCC, supra* note 43, 185 U.S.App.D.C. at 168, 567 F.2d at 35 ("the opportunity to comment is meaningless unless the agency responds to significant points raised by the public"); *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 326–327 & n.67, 486 F.2d 375, 393–394 & n.67 (1973) ("Obviously a prerequisite to the ability

to make meaningful comment is to know the basis upon which the rule is proposed.").

**52.** *See* 189 U.S.App.D.C. at ———–———, 584 F.2d at 524, *supra.*

**53.** JA 67.

**54.** JA 71.

page 72 describes notices received from the German and French governments through their Washington embassies "that they strongly support ICT's participation in the joint service and urge the Commission to approve its admission." It also details the position of the Euro-Pacific parties that it is "imperative to have the financial support of ICT in order to finalize any plans for future buildings and to produce and maintain the frequency and quality of service that will be necessary for them to survive in this trade." *Id.* Finally, it relates that the Euro-Pacific parties,

> through their attorney, have urged the staff to convey to the Commission their concept of ICT as the direct substitute for HAL in this trade and in the joint service. Therefore, since the Commission determined that there was economic and commercial justification for HAL's participation in the joint service, they view this as a precedent for ICT's participation in the joint service as well. They feel that the Commission, like USL, may have misconceived ICT as a totally *"new service* and a *new participant* in the trade" and its inclusion in the joint service as "creating a *new* and far reaching *'consortium'* with a *new partner."* ([emphasis] added) However, they see it differently. They do not consider ICT to be a "new service" or "new participant in the trade" but rather a return to the trade of an old and long standing service and participant, HAL, with the only change being in the name and the owners. Instead of "creating a new . . . 'consortium' with a new partner," the parties conceive of ICT's joining the joint service as an act of rejoining and of recreating a relationship which previously existed and which the Commission sanctioned.

JA 72–73.

Even this brief outline of the *ex parte* communications in this case makes clear that secret *ex parte* contacts were employed both to introduce new arguments and positions and to respond to and rebut the arguments which protestant USL made in its public filings. Although the notices from the French and German governments were in no way classified, it appears that they were never mentioned or made available to the parties or to the public; USL, in particular, was completely unaware of the active support of Agreement 9902–3 by foreign governments. Similarly, the argument that addition of ICT was financially imperative to Euro-Pacific's continued survival appears nowhere in Euro-Pacific comments; it emerged for the first time in these *ex parte* communications. Finally, the argument that ICT should be permitted to join the service as the successor to HAL—albeit with a different name and different owners—was clearly intended to respond to the argument publicly made by USL that addition of a third party which is itself a potential competitor and which is controlled by a dominant carrier raises serious antitrust questions requiring a hearing for their resolution. Euro-Pacific had noted in its filed response to USL's comments that HAL, the former third party in the Euro-Pacific service, had been reorganized under new control as ICT.[55] But the Euro-Pacific parties did not make in their public response the more specific and legalistic argument that the Commission's prior approval of HAL's participation in the joint service served as a precedent justifying, on economic and commercial grounds, ICT's proposed participation.

USL was unaware of all these contacts. Nor is it reasonable to assume that any other member of the public knew or could have known of their existence, let alone their substance. Indeed, it was not until preparation of the joint appendix to this review action that USL first learned of the existence of *ex parte* contacts prior to the Commission's decision.

██ It is, of course, impossible to determine the precise influence of these *ex parte* contacts on the Commission's final decision. The fact that the Commission reversed its judgment on the participation of ICT in the conference after being informed of the sub-

stance of these contacts, however, raises the spectre of a substantial influence on the approval decision; indeed, it provides at least one explanation of what the Commission was referring to when it cited "reliable data reposing in the Commission's files" as support for its decision.[56] But whether or not this refers to the *ex parte* communications at issue, the fact remains that these communications are inconsistent with both the "hearing" provided by statute and the requirements of judicial review under the Administrative Procedure Act.

### 3. Ex Parte *Contacts and the Section 15 Hearing Requirement*

 Under the Shipping Act notice and a hearing are required prior to Commission approval of any agreement subject to Section 15. The Commission is charged by statute with enforcing the public interest, and it recognizes the right of the public—be it carrier, exporters, or interested consumers—to participate in the required hearing.[57] The public right to participate in a hearing, however, is effectively nullified when the agency decision is based not on the submissions and information known and available to all, but rather on the private conversations and secret points and arguments to which the public and the participating parties have no access. In such cases the exercise of permitting public comment and response by interested parties— the "hearing"—is nothing more than a sham.

The inconsistency of secret *ex parte* contacts with the notion of a fair hearing and with the principles of fairness implicit in due process has long been recognized. In *Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938), the Supreme Court stated: "The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one." And in *Sangamon Valley Television Corp. v. United States*, 106 U.S.App.D.C. 30, 33, 269 F.2d 221, 224 (1959), we held that "basic fairness" required that a rulemaking proceeding to allocate television channels among communities "be carried on in the open," without *ex parte* contacts. Most recently, in *Home Box Office, Inc. v. FCC, supra*, we set aside FCC regulations relating to cable and subscription television in part because of prohibited *ex parte* communications between industry leaders and the Commission during the rulemaking proceeding. In that case we noted that "this is a time when all branches of government have taken steps 'designed to better assure fairness and to avoid suspicions of impropriety,' * * * and consequently we have no hesitation in concluding with *Sangamon* that due process requires us to set aside the Commission's rules here." 185 U.S.App. D.C. at 190, 567 F.2d at 57, *quoting* White House Fact Sheet on Executive Order 11920 (June 10, 1976).

The instant case is not identical in all respects with either *Sangamon Valley or Home Box Office. Sangamon Valley* involved "resolution of conflicting private claims to a valuable privilege," 106 U.S. App.D.C. at 33, 269 F.2d at 224, a description which is not entirely applicable to this case. For although this case involves a privilege in the sense of exemption from the antitrust laws, it is not one to which there are competing claims which must be resolved in favor of one applicant or another. Nor does this case, like *Home Box Office*, deal with notice and comment rulemaking governed by Section 553 of the APA. Rather, what is involved here appears quasi-adjudicatory in nature: the

---

**56.** JA 87; 189 U.S.App.D.C. at —— ——, 584 F.2d at 533, *supra.* . ₐ

**57.** Clearly, the function of the notice requirement of the Shipping Act, like the notice requirement of § 553 of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1976), is to alert interested members of the public as to the proposed agreement so that they may participate in an informed fashion in the agency proceedings dealing with this agreement. *See Home Box Office, Inc. v. FCC, supra* note 43, 185 U.S.App.D.C. at 168, 567 F.2d at 35.

agency is required to adjudicate the rights of certain named parties to an exemption from the antitrust laws. But in doing so the FMC, like the FCC in *Sangamon Valley* and *Home Box Office,* is charged with enforcing and guarding the public interest, with the impact of its decision extending well beyond the immediate parties involved. Moreover, however we label the proceedings involved here and in our earlier cases, the common theme remains: that *ex parte* communications and agency secrecy as to their substance and existence serve effectively to deprive the public of the right to participate meaningfully in the decision-making process.[58]

Our earlier decisions dealing with *ex parte* contacts, as well as prior cases requiring an agency to provide initial notices of proposed action, to disclose internal reports, and to state its reasons for acting as it did,[59] all rest on the fundamental proposition that the right to comment or the opportunity to be heard on questions relating to the public interest is of little or no significance when one is not apprised of the issues and positions to which argument is relevant. Only when the public is adequately informed can there be any exchange of views and any real dialogue as to the final decision.[60] And without such dia-

logue any notion of real public participation is necessarily an illusion. This basic principle, embodied in this case in the requirement of a "hearing," was violated by the Commission's resort to *ex parte* comments.

■ That the proceedings in this case did not, because of the *ex parte* contacts, amount to the "hearing" guaranteed by statute is patently clear. While the Commission enjoys substantial flexibility in structuring its hearings in light of the issues involved,[61] the requirement of a hearing to determine the public interest means, at a very minimum, that an opportunity must be afforded for meaningful public participation. In this case there was no such opportunity. To be sure, USL and any other members of the public were free to submit arguments as to their positions on the agreement in question. But there was no opportunity for a real dialogue or exchange of views. USL was not informed of, let alone given the opportunity to respond to, the new arguments of Euro-Pacific or of the French and German governments as to the proposed agreement. Nor did USL know of or have the opportunity to respond to the arguments which Euro-Pacific conveyed secretly to the Commission in response to USL's protest. And it was after consideration of these *ex parte* argu-

---

58. The inconsistency of *ex parte* contacts with reasoned decisionmaking and fairness to the public has been increasingly recognized in recent years by Congress and the President, as well as by the courts. For example, in the Government in the Sunshine Act Congress declared that it is "the policy of the United States that the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government," Pub.L. No.94–409, § 2, 90 Stat. 1241 (Sept. 13, 1976); and it has enacted legislation to prohibit *ex parte* contacts in formal agency proceedings, *see* 5 U.S.C. § 557(d)(1) (1976). In a similar vein, Executive Order 11920, 12 Weekly Comp. of Presidential Documents 1040 (1976), prohibits *ex parte* contacts with White House staff members by those seeking to influence the President's approval of international air route allocations. *See generally Home Box Office, Inc. v. FCC, supra* note 43, 185 U.S.App.D.C. at 189–190, 567 F.2d at 56–57.

59. *See* 189 U.S.App.D.C. at ――, 584 F.2d at 534, *supra.*

60. *See Home Box Office, Inc. v. FCC, supra* note 43, 185 U.S.App.D.C. at 168–169, 189–190, 567 F.2d at 35–36, 56–57; *Portland Cement Ass'n v. Ruckelshaus, supra* note 51, 158 U.S. App.D.C. at 326–327, 486 F.2d at 393–394; *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 445, 478 F.2d 615, 649 (1973); *Automotive Parts & Accessories Ass'n v. Boyd, supra* note 43, 132 U.S.App.D.C. at 208, 407 F.2d at 338. *Cf. National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701 (2d Cir. 1975).

61. *See* p. ―― of 189 U.S.App.D.C., 538 of 584 F.2d *supra; Marine Space Enclosures, Inc. v. FMC, supra* note 29, 420 F.2d at 589. The agency is not free, however, to structure its procedures in violation of applicable statutory requirements or the requirements of judicial review under the Administrative Procedure Act. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

ments and responses, with no opportunity for further rebuttal, that the Commission reversed its position on participation of ICT.[62]

What we are confronted with, then, is an agency procedure denying meaningful participation to the public and an agency decision appearing to rest, at least in significant part, on communications never revealed to the protesting party or to the public. For a court to uphold this decision as satisfying the "hearing" required by statute would be to do violence not only to Section 15 but to the basic fairness concept of due process as well.

### 4. Ex Parte Contacts and Judicial Review

■ Ex parte contacts, in addition to being inconsistent with the "hearing" required by the Shipping Act, also foreclose effective judicial review of the agency's final decision according to the arbitrary and capricious standard of the Administrative Procedure Act. Under this standard the reviewing court must test the actions of the FMC for arbitrariness or inconsistency with delegated authority against "the full administrative record that was before the [agency official] at the time he made his decision." *Overton Park, supra,* 401 U.S. at 420, 91 S.Ct. at 825. But as we recognized in *Home Box Office, Inc. v. FCC, supra:*

> [H]ere agency secrecy stands between us and fulfillment of our obligation. As a practical matter, *Overton Park's* mandate means that the public record must reflect what representations were made to an agency so that relevant information supporting or refuting those representations may be brought to the attention of the reviewing courts by persons participating in agency proceedings. This course is obviously foreclosed if communications

are made to the agency in secret and the agency itself does not disclose the information presented. * * *

185 U.S.App.D.C. at 187, 567 F.2d at 54.

The agency's secrecy as to *ex parte* communications is particularly troublesome in this case. For what we do know about the course of the agency's decisionmaking suggests that these communications were vital to the agency decision. This necessarily calls into question whether the justifications put forth by the agency in its decision were in fact its motivating force. As we noted in *Home Box Office:*

> [W]here, as here, an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly, *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 415, 419–420 [91 S.Ct. 814]; *see* K. Davis, Administrative Law of the Seventies § 11.00 at 317 (1976), but must treat the agency's justifications as a fictional account of the actual decisionmaking process and must perforce find its actions arbitrary. *See Rupert v. Washington,* 366 F.Supp. 686, 690 (D.D.C.1973), *aff'd by order,* [177 U.S.App.D.C. 270, 543 F.2d 417] D.C. Cir. No. 73–1985 (Oct. 26, 1976).

185 U.S.App.D.C. at 187–188, 567 F.2d at 54–55.

To be sure, while we do not know the precise content of the agency communications or what was revealed of them to the Commission by its staff, we have some idea of the substance of the communications from the memorandum excerpted in the joint appendix. This memorandum, however, hardly provides a substitute sufficient

---

**62.** *See* JA 71. Obviously, an agency is free to set a date after which it will no longer receive or consider comments; argument and counter-argument cannot last indefinitely, and one party will inevitably have the "last word." But it is one thing to draw a reasonable deadline for receipt of public comments and argument; it is quite another to hear out parties secretly, thus depriving the public of any opportunity at all to respond. Moreover, so long as comments received by the agency are available to the public, reconsideration may be sought after the agency's decision to rebut findings or conclusions based on arguments submitted in the final stages of deliberation. *See* pp. ——–—— of 189 U.S.App.D.C., 534–535 of 584 F.2d *supra.*

to allow for the "searching and careful" judicial inquiry required by *Overton Park.* Moreover, even if the detailed contents of the *ex parte* contacts were revealed by the agency on judicial review, we would still be deprived of the benefit of an adversarial discussion among the parties. Our cases, discussed earlier with respect to blind references, make clear the critical role of adversarial comment in ensuring proper functioning of agency decisionmaking and effective judicial review. Such comment serves not only to clarify the issues and positions being considered at the agency level, but also to ensure that factual questions underlying the agency's decision are not raised, by necessity, for the first time on judicial review. And adversarial comment is particularly critical where, as here, *ex parte* communications are made by a party interested in securing the Commission approval necessary for the legality of its contracts; clear-

ly, the potential for bias in Euro-Pacific's presentation is as great as that posed in rulemaking proceedings which resolve "conflicting private claims to a valuable privilege," *Sangamon Valley Television Corp. v. United States, supra,* 106 U.S.App.D.C. at 33, 269 F.2d at 224, and is indeed greater than in those cases where we have reversed agencies for failure to disclose internal studies. *See Home Box Office, Inc. v. FCC, supra,* 185 U.S.App.D.C. at 188, 567 F.2d at 55.

### 5. *Summary*

The statutory requirement of a hearing in Section 15 proceedings as well as the governing standards for judicial review make clear that *ex parte* contacts should not have been allowed in these proceedings.[63] It is the obligation of the agency,

---

**63.** Our holding here is no way inconsistent with the decision of this court in *Courtaulds (Alabama) Inc. v. Dixon,* 111 U.S.App.D.C. 115, 294 F.2d 899 (1961). In that case the court upheld procedures employed by the Federal Trade Commission notwithstanding a stipulation that the Commission had considered *ex parte* communications. In so doing, however, the court stated: "We find no evidence that the Commission improperly did anything in secret or gave to any interested party advantages not shared by all." *Id.* at 904–905. Further, the court specifically noted that the *ex parte* submissions were "canvassed with the appellant, Government spokesmen and others * * *." *Id.* at 120, 294 F.2d at 904. *See generally Home Box Office, Inc. v. FCC, supra* note 43, 185 U.S.App. D.C. at 189 & n.124, 567 F.2d at 56 n.124 (distinguishing *Courtaulds*). In this case, on the other hand, we are squarely presented with a situation in which one interested party had private access to the Commission and in which a decision was made based at least in part on contacts which were kept completely secret.

Nor is our conclusion here inconsistent with the Supreme Court's recent decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., supra* note 61. In *Vermont Yankee* the Supreme Court held that, absent constitutional constraints or extremely compelling circumstances, administrative agencies should be free to fashion their own rules of procedure. The Court thus reversed a decision of this court which had held that the procedures employed by the agency in a rulemaking proceeding were inadequate.

The freedom of administrative agencies to fashion their procedures recognized in *Vermont*

*Yankee,* however, does not encompass freedom to ignore statutory requirements. The *Vermont Yankee* Court was careful to point out that "[o]f course, the court must determine whether the agency complied with the procedures mandated by the relevant statutes." 435 U.S. at 549 n.21, 98 S.Ct. at 1214, *citing Citizens to Preserve Overton Park, Inc. v. Volpe, supra* note 40, 401 U.S. at 417, 91 S.Ct. 814. Nor does *Vermont Yankee* provide a basis for agency procedures or practices which effectively foreclose judicial review where, as here, such review is provided for by statute. Nothing in that decision calls into question the well established principle, found in the Administrative Procedure Act and in the decisions of the Supreme Court, that the court is required to conduct a "searching and careful" inquiry to determine whether agency action is arbitrary or capricious, or, in appropriate cases, supported by substantial evidence. *See* 5 U.S.C. § 706 (1976); *Citizens to Preserve Overton Park, Inc. v. Volpe, supra* note 40, 401 U.S. at 415–417, 91 S.Ct. 814. Indeed, the *Vermont Yankee* decision remanded the case to the Court of Appeals for just such an inquiry.

In our decision today we have consistently recognized the freedom of the FMC to structure its hearings as it finds appropriate. We have rejected petitioner's arguments that a full evidentiary hearing with opportunities for oral presentations and cross-examination must of necessity be provided. Our prohibition of *ex parte* contacts is not based on our choice as to "which procedures are 'best' or most likely to further some vague, undefined public good." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., supra* note

consistent with its duty to afford a hearing and its responsibility to provide a record for judicial review, to guard against such contacts. And where they do unforeseeably occur, the agency must, as is the case with blind references, at least disclose the substance of these comments publicly and afford an opportunity for public response. Fairness requires no less.

### III. CONCLUSION

The FMC, in deciding whether to approve agreements under Section 15, is charged with considering and guarding the public interest. This responsibility requires the agency to consider the antitrust implications of the agreements submitted to it, for the public interest is not served where competition is restrained unnecessarily. Nor is the public interest served when the public is effectively excluded from the decisionmaking process, and the benefits of its participation lost, because of agency resort to and reliance upon blind references and *ex parte* communications. For such references and communications violate the ideals of fairness and public participation which are embodied in the statutory requirement of a hearing and undermine the efficacy of judicial review under the arbitrary and capricious standard.

The FMC's failure to consider the antitrust implications of Agreement 9902–3 requires remand of the record in this case for further consideration. Upon remand the agency enjoys substantial flexibility in structuring its procedures in view of the issues which it must resolve. But it cannot, in the guise of reasoned decisionmaking, effectively eliminate the roles of the public and of this court in the decisionmaking and review processes.

*Remanded.*

---

61, 435 U.S. at 549, 98 S.Ct. at 1214. Rather, it is based on the statutory requirements of a hearing before the FMC and of judicial review under an arbitrary and capricious standard which Congress has chosen to impose.